**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| S. Y. and C. S., | ) |
| | ) |
|         Plaintiffs, | ) |
| | ) |
|   vs. | )   Case No.: 2:20-cv-118-FtM-60MRM |
| | ) |
| | ) |
| | )   **JURY TRIAL DEMANDED** |
| | ) |
| | ) |
| NAPLES HOTEL COMPANY, d/b/a | ) |
| GULFCOAST INN NAPLES; | ) |
| THE GULFCOAST INN OF NAPLES | ) |
| OWNERS ASSOCIATION, INC., d/b/a | ) |
| GULFCOAST INN NAPLES; | ) |
| | ) |
| BEST WESTERN INTERNATIONAL, | ) |
| INC., d/b/a BEST WESTERN | ) |
| NAPLES PLAZA HOTEL; | ) |
| R & M REAL ESTATE CO INC, d/b/a | ) |
| BEST WESTERN NAPLES PLAZA | ) |
| HOTEL; | ) |
| ROBERT VOCISANO CO-TR, d/b/a BEST | ) |
| WESTERN NAPLES PLAZA HOTEL; | ) |
| | ) |
| CHOICE HOTELS INTERNATIONAL, | ) |
| INC., d/b/a QUALITY INN & SUITES | ) |
| GOLF RESORT; | ) |
| ROBERT VOCISANO, d/b/a QUALITY | ) |
| INN & SUITES GOLF RESORT; | ) |
| | ) |
| CHOICE HOTELS INTERNATIONAL, | ) |
| INC., d/b/a COMFORT INN & | ) |
| EXECUTIVE SUITES; | ) |
| R & M REAL ESTATE COMPANY INC., | ) |
| d/b/a COMFORT INN & | ) |
| EXECUTIVE SUITES; | ) |
| | ) |
| WYNDHAM HOTELS & RESORTS, INC. | ) |
| d/b/a DAYS INN; | ) |
| HANUMAN OF NAPLES LLC d/b/a DAY | ) |

SHREE SIDDHIVINAYAK )
HOSPITALITY, LLC d/b/a DAYS INN; )
and )
H. I. NAPLES LLC d/b/a DAYS INN; )
)
INTERCONTINENTAL HOTELS GROUP )
PLC d/b/a HOLIDAY INN EXPRESS; )
INTERCONTINENTAL HOTELS GROUP )
RESOURCES, LLC d/b/a HOLIDAY INN )
EXPRESS; )
HIE TOLLGATE BLVD LLC d/b/a )
HOLIDAY INN EXPRESS; )
)
INTERCONTINENTAL HOTELS GROUP )
PLC d/b/a STAYBRIDGE SUITES; )
INTERCONTINENTAL HOTELS GROUP )
RESOURCES, LLC d/b/a STAYBRIDGE )
SUITES; )
NAPLES CFC ENTERPRISES LTD d/b/a )
STAYBRIDGE SUITES; )
)
MARRIOTT INTERNATIONAL, INC. )
d/b/a RESIDENCE INN BY MARRIOTT; )
RESIDENCE INN BY MARRIOTT, LLC )
d/b/a RESIDENCE INN BY MARRIOTT; )
CSM RI NAPLES LLC d/b/a RESIDENCE )
INN BY MARRIOTT; )
CSM CORPORATION d/b/a RESIDENCE )
INN BY MARRIOTT; )
)
WYNDHAM HOTELS & RESORTS, INC. )
d/b/a LA QUINTA INN; )
LA QUINTA HOLDINGS INC. d/b/a LA )
QUINTA INN; )
LA QUINTA PROPERTIES, INC. d/b/a LA )
QUINTA INN; )
COREPOINT LODGING, INC. and CPLG )
LLC d/b/a LA QUINTA INN; )
LQ FL PROPERTIES LLC, name change )
CPLG FL PROPERTIES LLC d/b/a LA )
QUINTA INN; )
)
WYNDHAM HOTELS & RESORTS, INC. )
d/b/a SUPER 8 BY WYNDHAM; )
LAXMI OF NAPLES, LLC d/b/a SUPER 8 )
BY WYNDHAM; )

WYNDHAM HOTELS & RESORTS, INC.          )
d/b/a RAMADA BY WYNDHAM                 )
NAPLES;                                 )
RIST PROPERTIES LLC d/b/a RAMADA        )
BY WYNDHAM NAPLES;                      )
                                        )
NAPLES GARDEN INN, LLC, d/b/a           )
NAPLES GARDEN INN;                      )
LAPORTA FLORIDA CENTER LLC d/b/a        )
NAPLES GARDEN INN;                      )
                                        )
UOMI & KUDAI, LLC, d/b/a SPINNAKER      )
INN;                                    )
                                        )
SHIVPARVTI, LLC, d/b/a  SUNRISE         )
MOTEL;                                  )
MASTER CLEANERS PRO SERVICES            )
INC, d/b/a SUNRISE MOTEL;               )
                                        )
HOLISTIC HEALTH HEALING, INC.,          )
d/b/a CONTY'S MOTEL;                    )
                                        )
JAY VARAHIMATA INVESTMENTS,             )
LLC, d/b/a GLADES MOTEL;                )
                                        )
INN OF NAPLES HOTEL, LLC, d/b/a INN     )
OF NAPLES;                              )
                                        )
SEASONAL INVESTMENTS, INC., d/b/a       )
FAIRWAYS INN OF NAPLES;                 )
                                        )
SUNSTREAM HOTELS & RESORTS,             )
LLC d/b/a PARKSHORE RESORTS;            )
PARK SHORE RESORT CONDOMINIUM           )
ASSOCIATION, INC. d/b/a PARKSHORE       )
RESORTS;                                )
                                        )
SEA SHELL MANAGEMENT, LLC, d/b/a        )
SEA SHELL MOTEL; and                    )
CLAYTON PLAZA, LLC, d/b/a SEA           )
SHELL MOTEL;                            )
                                        )

     Defendants.

## SECOND AMENDED COMPLAINT

Plaintiffs S.Y. and C.S., by and through their undersigned attorneys, hereby files this Complaint against Defendants, NAPLES HOTEL COMPANY, d/b/a GULFCOAST INN NAPLES; THE GULFCOAST INN OF NAPLES OWNERS ASSOCIATION, INC., d/b/a GULFCOAST INN NAPLES (collectively "Gulfcoast Inn");

BEST WESTERN INTERNATIONAL, INC., d/b/a BEST WESTERN NAPLES PLAZA HOTEL; R & M REAL ESTATE CO INC, d/b/a BEST WESTERN NAPLES PLAZA HOTEL; ROBERT VOCISANO CO-TR, d/b/a BEST WESTERN NAPLES PLAZA HOTEL; (collectively "Best Western Naples Plaza")'

CHOICE HOTELS INTERNATIONAL, INC., d/b/a QUALITY INN & SUITES GOLF RESORT, and ROBERT VOCISANO d/b/a QUALITY INN & SUITES GOLF RESORT (collectively, "Quality Inn Choice Hotels")

CHOICE HOTELS INTERNATIONAL, INC., d/b/a COMFORT INN &  EXECUTIVE SUITES; R & M REAL ESTATE COMPANY INC., d/b/a COMFORT INN & EXECUTIVE SUITES; (collectively "Comfort Inn Choice Hotels");

WYNDHAM HOTELS & RESORTS, INC. d/b/a DAYS INN, HANUMAN OF NAPLES LLC d/b/a DAYS INN, SHREE SIDDHIVINAYAK HOSPITALITY, LLC d/b/a DAYS INN, and H. I. NAPLES LLC d/b/a DAYS INN ("collectively Days Inn Wyndham Hotels"),

INTERCONTINENTAL HOTELS GROUP PLC d/b/a HOLIDAY INN EXPRESS; INTERCONTINENTAL HOTELS GROUP RESOURCES, LLC d/b/a HOLIDAY INN EXPRESS; HIE TOLLGATE BLVD LLC d/b/a HOLIDAY INN EXPRESS (collectively "Holiday Inn Express IHG");

INTERCONTINENTAL HOTELS GROUP PLC d/b/a STAYBRIDGE SUITES; INTERCONTINENTAL HOTELS GROUP RESOURCES, LLC d/b/a STAYBRIDGE SUITES; NAPLES CFC ENTERPRISES LTD d/b/a STAYBRIDGE SUITES (collectively "Staybridge IHG");

MARRIOTT INTERNATIONAL, INC. d/b/a RESIDENCE INN BY MARRIOTT; RESIDENCE INN BY MARRIOTT, LLC d/b/a RESIDENCE INN BY MARRIOTT; CSM RI NAPLES LLC d/b/a RESIDENCE INN BY MARRIOTT; CSM CORPORATION d/b/a RESIDENCE INN BY MARRIOTT, (collectively "Residence Inn Marriott");

WYNDHAM HOTELS & RESORTS, INC. d/b/a LA QUINTA INN; LA QUINTA HOLDINGS INC. d/b/a LA QUINTA INN, LA QUINTA PROPERTIES, INC. d/b/a LA QUINTA INN; COREPOINT LODGING INC d/b/a LA QUINTA INN; CPLG LLC d/b/a LA QUINTA INN; and LQ FL PROPERTIES LLC, name change CPLG FL PROPERTIES LLC d/b/a LA QUINTA INN (collectively "La Quinta Wyndham Hotels");

WYNDHAM HOTELS & RESORTS, INC. d/b/a SUPER 8 BY WYNDHAM; and LAXMI OF NAPLES LLC d/b/a SUPER 8 BY WYNDHAM (collectively "Super 8 Wyndham");

WYNDHAM HOTELS & RESORTS, INC. d/b/a RAMADA BY WYNDHAM NAPLES; RIST PROPERTIES LLC d/b/a RAMADA BY WYNDHAM NAPLES; (collectively "Ramada Wyndham");

NAPLES GARDEN INN, LLC, d/b/a NAPLES GARDEN INN, LAPORTA FLORIDA CENTER LLC d/b/a NAPLES GARDEN INN (collectively "Garden Inn");

UOMI & KUDAI, LLC d/b/a SPINNAKER INN ("Spinnaker");

SHIVPARVTI, LLC, d/b/a SUNRISE MOTEL; MASTER CLEANERS PRO SERVICES INC, d/b/a SUNRISE MOTEL ("collectively Sunrise Motel");

5

HOLISTIC HEALTH HEALING, INC., d/b/a CONTY'S MOTEL ("Conty's Motel");

JAY VARAHIMATA INVESTMENTS, LLC, d/b/a GLADES MOTEL ("Glades motel");

INN OF NAPLES HOTEL, LLC, d/b/a INN OF NAPLES ("Inn of Naples");

SEASONAL INVESTMENTS, INC., d/b/a FAIRWAYS INN OF NAPLES ("Fairways Inn");

SUNSTREAM HOTELS & RESORTS, LLC d/b/a PARKSHORE RESORTS; PARK SHORE RESORT CONDOMINIUM ASSOCIATION, INC. d/b/a PARKSHORE RESORTS; (collectively "Parkshore Resorts");

SEA SHELL MANAGEMENT, LLC, d/b/a SEA SHELL MOTEL and CLAYTON PLAZA LLC, d/b/a SEA SHELL MOTEL (collectively "Sea Shell Motel").

Plaintiffs allege against their respective Defendants as follows:

## **INTRODUCTION**

1.      Human sex trafficking is a form of modern-day slavery that illegally exists throughout the United States and globally and is furthered by public lodging establishments.

2.      For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country.  Criminals parade their misconduct openly on hotel properties throughout the United States while the hotels and hospitality industry remain willfully blind to the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

3.      Human trafficking is the world's fastest growing crime.  While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of all illegal drugs.

Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Hotels are the chosen venue for sex traffickers, or 'pimps' to carry out the foregoing. The passage of the Trafficking Victims Protection Reauthorization Act in 2008 and countless other legislative initiatives have put hotel owners, operators and/or franchisees on notice of the high likelihood of these illegal acts occurring on hotel premises, which, at a minimum, warranted hotel owners, operators and/or franchisees to be all the more vigilant and proactive in preventing this conduct.

5.      This action for damages is brought by the Plaintiffs, survivors of sex trafficking, hereinafter identified by their initials S.Y. and C.S. respectively, under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA"), 18 U.S.C. § 1595.

6.      This is an action against, *inter alia*, hotel owners, operators and/or franchisees who knew or should have known based on a combination of well-documented indicators that sex trafficking and other criminal activity was occurring, and would continue to occur, on their hotel premises as a result of their misfeasance and nonfeasance.

7.      At all material times, the Defendants individually and/or by their actual or apparent agents, operators, servants, franchisees and/or employees aided, concealed, confined, benefitted and profited from sex trafficking and other criminal activity that was occurring on their hotel premises.

8.      At all material times, the Defendants individually and/or by their actual or apparent agents, operators, servants, franchisees and/or employees harbored human traffickers on their premises and/or failed to rectify the foreseeable risks of sex trafficking and other criminal activity that was occurring and would continue to occur on their hotel premises.

9.      At all material times, the Defendants individually and/or by their actual or apparent agents, operators, servants, franchisees and/or employees failed to take steps to prevent dangerous conditions from existing on their hotel premises, failed to ensure the premises were safe and secure from criminal conduct and failed to report suspicious conduct, such as human sex trafficking at their hotels.

10.      As a result of the Defendants' failure to act and their negligent operations, the Defendants allowed their premises to be a vehicle for carrying out human trafficking, sex crimes and other unlawful conduct. While the Defendants profited from the room occupancy, which in turn translated to franchise royalty fees and increased property value, and/or food and beverage sales on site, as well as ATM fees, the Plaintiffs were being exposed to continuous and repeated dangerous conditions as a sex slave that resulted in the Plaintiffs' confinement, bodily injuries, property damage, emotional distress, mental harm and anguish from approximately 2013 and continued through to approximately February of 2016.

11.      During this period from 2013 to 2016, Defendants were on notice about the prevalence of sex trafficking generally at their hotels and they failed to take adequate steps that would have prevented its occurrence.

12.      During this period from 2013 to 2016, Defendants failed to implement sufficient educational and training programs on sex trafficking within their respective corporate chain of command, as well as failed to implement policies for preventing, identifying, reporting, documenting, investigating, and stopping sex trafficking on their properties.

13.      During this period from 2013 to 2016, Defendants knew or should have known that S.Y. and C.S. were being trafficked at their properties and they failed to act upon the obvious signs alerting them to the crimes taking place within their hotels.

14.     The Plaintiffs bring this action for damages against their respective Defendants listed herein. Each of the Defendants, in violation of the Trafficking Victims Protection Reauthorization Act 18 U.S.C. § 1595, knowingly benefited from a venture that they knew, or should have known, to be engaging in sex trafficking in violation of 18 U.S.C. § 1591(a) and (b), and who enabled, harbored, facilitated or financially benefited, or any combination of the foregoing, from a sex trafficking venture in which Plaintiffs S.Y. and C.S. were trafficked for sex, sexually exploited, and victimized in violation of the TRPA.

15.     As a direct and proximate result of the Defendants' willful blindness, negligence, facilitation, misfeasance, nonfeasance and/or consistent refusals to prevent human trafficking on their hotel properties, the Plaintiff S.Y. and C.S. were drugged, starved, choked, beaten, sex trafficked, sexually exploited, physically abused, mentally abused, and victimized repeatedly at the Defendants' hotels in violation of the aforementioned statutes.

16.     This action is also for premises liability; false imprisonment; assault, battery and kidnapping; negligent infliction of emotional distress; invasion of privacy; breach of contract; unjust enrichment; unconscionable practices; negligence; and aiding and abetting a criminal enterprise and related offenses.

## JURISDICTION AND VENUE

17.     This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiffs' claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

## PARTIES

19.     At all times material to this complaint, Plaintiff S.Y. was a resident of Collier County, Florida and is otherwise *sui juris.* The Plaintiff is a "victim" of sex trafficking as protected under applicable provisions of the TVPRA

20.     At all times material to this complaint, Plaintiff C.S. was a resident of Collier County, Florida and is otherwise *sui juris.* The Plaintiff is a "victim" of sex trafficking as protected under applicable provisions of the TVPRA.

21.     Defendant Naples Hotel Company and Gulfcoast Inn of Naples Owners' Association, Inc. are both Florida Corporations.

22.     At all times material to this complaint, Naples Hotel Company and Gulfcoast Inn of Naples Owners Associations, Inc. were doing business collectively as Gulfcoast Inn, and upon information and belief is authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely the Gulfcoast Inn Naples, located at 2555 Tamiami Trail N, Naples, FL 34103.

23.     Defendant Best Western International, Inc. ("Best Western") is an Arizona corporation headquartered in Phoenix, Arizona.

24.     Defendant Robert Vocisano ("Vocisano") is a real estate developer residing at 4100 Golden Gate Parkway in Naples Florida. Vocisano owns multiple properties in Naples Florida, including two hotels named in this Complaint.

25.     Defendant R&M Real Estate is a Florida corporation ("R&M"), located at 3860 Tollgate Blvd., Naples Florida 34114 owned by Vocisano.

26.     At all times material to this complaint, Best Western, R&M, and Vocisano are collectively doing business as Best Western Naples Plaza Hotel ("Best Western Naples Plaza") in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and are doing business in the State of Florida as a place of public lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Best Western Naples Plaza Hotel at 6400 Dudley Drive Naples, FL 34105.

27.     Defendant Choice Hotels International, Inc. ("Choice Hotels") is one of the largest hotel brands in the world. It is a Delaware corporation with its principal place of business located at 1 Choice Hotels Circle, Suite 400, Rockville, *Maryland* 20850.

28.     At all times material to this complaint,. Choice Hotels and Vocisano were doing business as Quality Inn ("Quality Inn Choice Hotels") in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Quality Inn Suites Golf Resort at 4100 Golden Gate Pkwy, Naples, Florida 34116.

29.     At all times material to this complaint, Choice Hotels and "R&M" were doing business as Comfort Inn & Executive Suites ("Comfort Inn Choice Hotels") in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper

of the hotel, namely the Comfort Inn & Executive Suites at 3860 Tollgate Blvd, Naples, Florida 34114.

30.      Defendant Wyndham Hotels & Resorts, Inc. is a Delaware corporation with its principal place of business located at 22 Sylvan Way, Parsippany, New Jersey 07054, is the "world's largest hotel franchising company" and claims to "mandate human trafficking training for all company employees" within each of its hotel brands' individual franchise properties, namely, the Days Inn, La Quinta, Ramada and Super 8 properties in Naples, Florida.[1]

31.      Defendant Hanuman of Naples, LLC ("Hanuman") is a Florida Limited Liability Company with its principal place of business located at 3837 Tollgate Boulevard, Naples, Florida.  Hanuman, by and through its managing-member Mukesh Patel, sold the Days Inn Wyndham property located at 3837 Tollgate Boulevard Naples, Florida 34114 in 2015 for approximately $2,790,000 to H. I. Naples LLC.

32.      H.I. Naples, LLC ("H.I. Naples") is a Florida Limited Liability Company ("H.I. Naples"), managed by member, Lawrence Raiche, a CPA with focus on business valuation and cost segregation studies on real estate properties in the hospitality industry.[2]  Without any improvements and just eleven (11) months later, H. I. Naples LLC sold the Days Inn Wyndham property in 2016 for approximately $4,030,000 to Shree Siddhivinayak Hospitality LLC.

33.      Shree Siddhivinayak Hospitality LLC ("Shree Hospitality") is a Florida Limited Liability Company owned by managing members, Dharmendra Patel [3] and Tarun Patel, a Certified Hotel

---

[1] https://corporate.wyndhamhotels.com/news-releases/wyndham-hotels-resorts-reinforces-efforts-to-combat-human-trafficking/; http://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_WH_2018.pdf

[2] Raiche "concentrates his efforts in business valuation, real estate development, the hospitality industry and construction industry, with a focus on cost segregation studies on real estate properties which maximize the allowable depreciation deductions. Through this service, he assists commercial real estate owners defer hundreds of thousands of tax dollars, enabling them to grow their business and take significant strides." https://www.raichecpa.com/about

[3] Iowa-based hotelier Dharmendra Patel has been in the hospitality business for just three years, yet his three hotels (a Days Inn and two Super 8 properties) have generated almost $1,200,000 in revenue for 2016. https://www.biz2credit.com/knowledge-center/success-stories/dharmendra-patel-successful-hospitality-business

Administrator under the American Hotel and Lodging Association, a Certified Financial Manager (CFM) and CFO "specializing in investments and management in the hospitality industry."[4]

34. Notably, Mukesh Patel of Hanuman, and Dharmendra Patel and Tarun Patel of Shree Hospitality, are all past chairmen of AAHOA (Asian American Hotel Owners Association, Inc.), the "voice of America's hotel owners" whose "mission is to advance and protect the business interests of hotel owners" by "educat[ing] lawmakers and influencing the political process."[5]

35. At all times material to this complaint, Wyndham Hotels, Hanuman, Shree Hospitality and H. I. Naples LLC ("Days Inn Wyndham Hotels") were doing business as Days Inn in Naples, Florida, and upon information and belief were authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Days Inn & Suites by Wyndham at 3837 Tollgate Boulevard Naples, Florida 34114.

36. In 2019, the Days Inn Wyndham property was sold by Shree Hospitality for $8,975,000, more than double the price paid in 2016,[6] to HIE Tollgate Blvd LLC, a limited liability company, who in turn converted the Wyndham franchise property to a Holiday Inn Express, a franchise of IHG Hotels.

---

[4] https://www.linkedin.com/in/tarun-patel-49b10b8/

[5] AAHOA includes approximately 20,000 members, such as "Platinum Members" Wyndham, Best Western, Choice Hotels, IHG, La Quinta and Marriott. AAHOA's former president and CEO, Chip Rogers, now leads the American Hotel and Lodging Association ("AHLA"). AAHOA reported "its allies" at AHLA "continue to advance hoteliers' interests". AAHOA member benefits include "complimentary legal consultations from leading hospitality law firms," lobbying and educational resources. Although AAHOA was established over 30 years ago, it wasn't until 2018 that AAHOA first offered "online training designed to help hoteliers and their employees identify and respond to potential trafficking situations." In 2018, after successfully avoiding inclusion in the Fight ONLINE sex trafficking Act, AAHOA first started mentioning Sex trafficking in its agenda. AAHOA reported that only 1,423 members were "engaged in [its] education [on] Human Trafficking Awareness Training." In 2019, only 4,500 members were "certified" through Human Trafficking Awareness Training. Prior to 2017, "human trafficking" is not reported on AAHOA's annual report.
https://www.aahoa.com/docs/default-source/default-document-library/annualreport_2018_web2.pdf?sfvrsn=0; https://www.aahoa.com/docs/default-source/default-document-library/aahoa_annualreport2019.pdf?sfvrsn=ea512c9f_2; https://www.aahoa.com/docs/default-source/default-document-library/annualreport_2017_web

[6] One improvement was made in April 2017; a brick deck was laid around the existing swimming pool.

37.     In absence of an expired franchise term, such a transaction required IHG Hotels' and Wyndham Hotels' corporate due diligence and approval, due to the franchise royalty to be gained or lost, respectively, from room revenues of the franchised hotel.[7]

38.     Defendant Intercontinental Hotels Group PLC and Defendant Intercontinental Hotels Group Resources, LLC are Delaware corporations with its principal place of business located at 3 Racinia Drive, Suite 100 Atlanta, Georgia (collectively "IHG Hotels").

39.     Defendant HIE Tollgate Blvd, LLC ("HIE Tollgate") is a Florida limited liability corporation with its principal place of business located at 3837 Tollgate Boulevard, Naples, Florida.

40.     At all times material to this complaint, IHG Hotels and HIE Tollgate were doing business as Holiday Inn Express IHG in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Holiday Inn Express located at 3837 Tollgate Boulevard, Naples, Florida 34014.

41.     Defendant Naples CFC Enterprises Ltd. is a Florida limited partnership with its principal place of business located at 4805 Tamiami Trail North, Naples, Florida.

42.     At all times material to this complaint, IHG Hotels and Naples CFC Enterprises LTD, a Florida Limited Partnership were doing business as Staybridge Suites ("Staybridge IHG") in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor,

---

[7] http://www.annualreports.com/HostedData/AnnualReports/PDF/NYSE_WH_2018.pdf

controller and innkeeper of the hotel, namely the Staybridge Suites Naples-Gulf Coast at 4805 Tamiami Trail N, Naples, FL 34113.

43.     Marriott International, Inc., is a Delaware corporation with its principal place of business as 10400 Fernwood Road, Dept. 924.13, Bethesda, Maryland 20817.

44.     At all times material to this complaint, Marriott Hotels by and through its subsidiaries and franchisees, namely, CSM RI Naples LLC, a Florida limited liability company and CSM Corporation, a Minnesota corporation with a principal address of 500 Washington Avenue South, Suite 3000, Minneapolis, Minnesota 55415, does business as Residence Inn by Marriott (collectively "Residence Inn Marriott Hotels") in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Residence Inn by Marriott Naples at 4075 Tamiami Trail N, Naples, FL 34103.

45.     La Quinta Holdings,  Inc. is a Forida corporation with a principal address of 205 Worth Avenue, #303, Palm Beach, Florida 33480.

46.     La Quinta Properties, Inc. is a Texas corporation with a principal address of 909 Hidden Ridge, suite 600, Irving, Texas 75038.

47.     CPLG, LLC is a Texas limited liability company with a principal address of 125 E. John Carpenter Freway, Site 1650, Irving, Texas 75062.

48.     LQ FL Properties, LLC. name change CPLG FL Properties LLC is a Texas limited liability company with a principal address of 125 E. John Carpenter Freway, Site 1650, Irving, Texas 75062

49.     At all times material to this complaint Wyndham Hotels and CorePoint Lodging Inc., a Delaware corporation, by and through its subsidiaries and franchisees, namely, La Quinta

Holdings, Inc., La Quinta Properties, Inc., CPLG LLC and CPLG FL Properties LLC (collectively "La Quinta Wyndham Hotels"), were doing business as La Quinta Inn in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the La Quinta Inn & Suites by Wyndham Naples Downtown at 1555 5th Ave S, Naples, FL 34102 and the La Quinta Inn & Suites by Wyndham Naples East at 185 Bedzel Cir. Naples, FL 34104.

50.     At all times material to this complaint, Wyndham Hotels and Laxmi of Naples LLC, a Florida Limited Liability Company, owned by managing-member Chetan Patel, a Regional Director of AAHOA, was doing business as Super 8 by Wyndham (collectively "Super 8 Wyndham Hotels"), in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Super 8 by Wyndham Naples at 3880 Tollgate Blvd, Naples, FL 34114.

51.     At all times material to this complaint, Wyndham Hotels and Rist Properties LLC, a Florida Limited Liability Company were doing business as Ramada by Wyndham Naples (collectively "Ramada Wyndham Hotels") in Naples, Florida, and upon information and belief are authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and were, at all times, by and through their agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Ramada by Wyndham Naples at 1100 Tamiami Trail N, Naples, FL 34102.\

52.     At all times material to this complaint, Naples Garden Inn, LLC, and LaPorta Florida

Center LLC , both Florida Limited Liability companies, were doing business as Naples Garden

Inn (collectively "Naples Garden Inn") in Naples, Florida, and upon information and belief is

authorized to do, licensed to do, and doing business in the State of Florida as a place of public

lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees,

the owner, operator, manager, supervisor, controller and innkeeper of the hotel, namely the Naples

Garden Inn at 2630 Tamiami Trail N, Naples, FL 34103.

53.     At all times material to this complaint,  Uomi & Kudai, LLC ("Spinnaker Inn") was and is

a Florida Limited Liability company, with its principal place of business in Naples, Florida, and

upon information and belief is authorized to do, licensed to do, and doing business in the State of

Florida as a place of public lodging, and was, at all times, by and through its agents, servants,

franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper

of a hotel, namely the Spinnaker Inn located at 6600 Dudley Dr, Naples, FL 34105.

54.     Defendant Shivparvti, LLC. is a Florida Limited Liability company owned by managing

members and AAOHA regional directors Yogesh Patel and Bharti Patel ("Shivparvti") acquired

the 1958 Sunrise Motel in May 2014 for $420,000.  With no improvements made to the property,

five years later, in May 2019, Shivparvti sold the Sunrise Motel for nearly four times the purchase

price, $1,550,000, to Master Cleaners Pro Services Inc., a Florida Corporation ("Master

Cleaners").

55.     At all times material to this complaint, Shivparvti, and Master Cleaners (collectively

"Sunrise Motel"), were and are authorized to do, licensed to do, and doing business in the State of

Florida as a place of public lodging, and was, at all times, by and through their agents, servants,

franchisees and/or employees, were the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely the Sunrise Motel located at 2486 Tamiami Trail E, Naples, FL 34112.

56.     At all times material to this complaint, Holistic Health Healing, Inc. ("Conty's Motel") was and is a Florida corporation, with its principal place of business in Naples, Florida, and upon information and belief is authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely Conty's Motel located at 11238 Tamiami Trail E, Naples, FL 34113.

57.     At all times material to this complaint, Jay Varahimata Investments, LLC, a limited liability company, owned by managing members and AAOHA regional directors, Yogesh Patel and Bharti Patel, does business in Naples Florida as Glades Motel (collectively "Glades Motel"), and upon information and belief was authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through their agents, servants, franchisees and/or employees, were the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely the Glades Motel located at 3115 Tamiami Trail E, Naples, FL 34112.

58.     At all times material to this complaint, Inn of Naples Hotel, LLC (fee simple owner per the deed) and the Inn of Naples, LLC, both Florida Limited Liability companies ("Inn of Naples"), upon information and belief is authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through its agents, servants, franchisees and/or employees, the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely the Inn of Naples, located at 4055 Tamiami Trail N, Naples, FL 34103.

59.     At all times material to this complaint, Seasonal Investments, Inc, was and is a Foreign Profit corporation located at 11500 Olive Blvd., Suite 240, Saint Louis, Missouri 63141, and upon

information and belief is was authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through their agents, servants, franchisees and/or employees, were the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely Fairways Inn of Naples located at 103 Palm River Blvd, Naples Fl 34110 ("Fairways Inn").

60.     Defendant Sunstream Hotels & Resorts, LLC, a Florida Limited Liability with its principal address at 6620 Estero Blvd, Ft. Myers Beach Fl. 33931, and Defendant Park Shore Resort Condominium Association, Inc., a Florida corporation with its principal place of business as 600 Neapolitan Way in Naples Florida, collectively do business as Park Shore Resort.

61.     At all times material to this complaint, Park Shore Resort  is authorized to do, licensed to do, and doing business in the State of Florida as a place of public lodging, and was, at all times, by and through their agents, servants, franchisees and/or employees, were the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely Parkshore Resort located at 600 Neapolitan Way in Naples Florida 34103.

62.     At all times material to this complaint, Sea Shell Management LLC, and Clayton Plaza LLC, both Foreign Limited Liability companies with its principal place of business at 107 S. Meramec, St. Louis MO 63105, was doing business as Sea Shell Motel in Naples ("Sea Shell Motel") and was authorized to do and licensed to do business in the State of Florida as a place of public lodging, and was, at all times, by and through their agents, servants, franchisees and/or employees, were the owner, operator, manager, supervisor, controller and innkeeper of a hotel, namely Sea Shell Motel located at 82 9th Street South, Naples Florida.

63.     At all relevant times, all Defendant hotels were licensed to do and doing business in Florida and are otherwise *sui juris*.

64.     At all times material to this complaint, Defendants' premises were used by Plaintiffs' sex traffickers to further an illegal enterprise of, among other things, sex trafficking and the sale of illegal drugs.

## SEX TRAFFICKING UNDER FEDERAL LAW

65.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

66.     Sex trafficking ventures are prohibited by federal criminal law. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590.  The crime of slavery can be divided into two (2) elements: the act and the means.  The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

67.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. §1591, it is nevertheless a long-recognized and familiar atrocity.

68.     Pursuant to 18 U.S.C. §1591(a) and (b), all who knowingly provide *or* obtain commercial sex that was provided or obtained through force, fraud, and coercion *or* from a person under the age of 18 years old are guilty of sex trafficking.  This includes, at a minimum, ***both*** the 'traffickers' who recruit, harbor, transport, and provide individuals for forced commercial sex work ***and*** the 'Johns' or 'buyers' who obtain, solicit, or patronize forced commercial sex work.

## STATEMENT OF FACTS

### Defendants' Duty Of Care To Patrons

69.    The Defendants are for-profit hotels and/or public lodging establishments pursuant to Chapter 509 of the Florida Statutes, which imposes legal responsibilities upon hotels, like those owned and operated by the Defendants, to take action to protect people. In Florida, hotels are "innkeepers" and owe patrons a special duty of care.

70.    The Defendants' hotel premises include a common space, private rooms and parking lot, which abuts to a sidewalk or land which the Defendant has possession, custody, or control of as it relates to the Defendants' business of providing public lodging.[8]

71.    The Defendants' hotel premises abut to pathways and/or parking lots and they were or should have been aware that these neighboring parking lots, pathways, other driveways were being used by their patrons to traverse to and from the Defendants' hotels, thereby expanding the zone where the Defendants were to have prevented foreseeable risks of injury to the Plaintiff.[9]

72.    But aside from their special duty to patrons and guests on their property, such as S.Y and C.S., the Defendant hotels have one of the highest obligations to protect their guests from known or anticipated dangers, which includes sex trafficking and illegal enterprises.

### The Hospitality Industry's Participation in the Sex Trafficking Industry

73.    The hospitality industry plays a crucial role in the sex trade.  The trope of the "no-tell hotel" is certainly not a new one.  Hotels have long profited from their reputations as havens of privacy and discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime, drugs and sex trafficking in particular. According to National Human Trafficking

---

[8] If customers or clients are invited to use a convenient parking lot then the business owner may be liable for injuries they sustain on that lot even if it is not technically within the business' property line. *See Gutierrez v. Dade County School Bd.*, 604 So. 2d 852, 77 Ed. Law Rep. 1052 (Fla. 3d DCA 1992).

[9] *Borda v. East Coast Entertainment, Inc.*, 950 So. 2d 488 (Fla. 4th DCA 2007).

Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.  Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers ("Johns") who come to the hotel solely to purchase sex.  This is referred to as an 'in call'.  Hotels are also the venue of choice for buyers seeking an 'out call,' wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e. those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

74.     The problem is industry wide.  In the United States, more than 63% of all trafficking incidents happen in hotels ranging from luxury to economy.

75.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation.  From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur.

**The Hospitality Industry's Ability To Stop Sex Trafficking**

76.     Multiple statutes and initiatives starting in 1997,[10] have informed, mandated, called for, and suggested hotels implement effective safeguards to mitigate the risk that human trafficking will occur at or involve their premises and personnel. Decades of data, step-by-step solutions and well-researched manuals published by anti-trafficking groups are available to the hotel industry to help hotel owners and staff in every position to identify the signs and stop the conduct. The

---

[10] Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign. These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.

foregoing imposes a legal obligation on the hospitality industry to simply ensure each property has taken all appropriate measures, and if not, to timely implement reasonable policies, training, education and security measures.

77.     Hotel employees are uniquely situated to identify and report suspicious activity on hotel property. From check-in to check-out there are numerous indicators that traffickers and the adults and children who are victimized by sex trafficking exhibit during their stay at a hotel. property. With proper training and other reasonable security measures, hotel owners and operators could prevent the trafficking of persons on their properties.

78.     A successful anti human trafficking protocol should start with a hotel's front desk staff. A hotel's front desk is first in line to spot warning signs of human trafficking. A successful anti human trafficking protocol also requires hotels to make information available throughout the facility for victims of human trafficking on how to seek help.

79.     Signs of sex trafficking at a hotel include, but are not limited to, the following: an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, renting two rooms next door to each other, declining housekeeping service for several consecutive days, significant foot traffic in and out of rooms, men traveling with multiple unrelated women, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.

80.     The Department of Homeland Security ("DHS") identifies a number of warning signs that indicate the presence of human trafficking at hotels. According to DHS, housekeeping, room service, maintenance, concierge, bellman, front desk, food and beverage, security, and valet staff at hotels all can and should be vigilant in observing indicia of human trafficking on the hotel premises such as:

a. persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

b. persons who lack freedom of movement or are constantly monitored;

c. persons who have no control over or possession of money or ID;

d. persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

e. requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

f. the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

g. extended stay with few or no personal possessions in the room;

h. excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion);

i. the same person reserves multiple rooms;

j. a room is rented hourly, less than a day, or for an atypical extended stay;

k. attempts to sell items to or beg from patrons or staff;

l. cars in the parking lot regularly parked backward, so the license plates are not visible;

m. loitering and solicitation of male patrons;

n. waiting at a table or bar and picked up by a male (trafficker or customer);

o. persons asking staff or patrons for food or money; and

p. persons taking cash or receipts left on tables.

81.     Hotel staff who have undergone training are more aware of human trafficking and can at best prevent it from happening or at worst, are more willing to report it when it happens, than hotel staff who have not been trained.

82.     Hotels and hotel brands can and should adopt policies and procedures related to human trafficking and make anti human trafficking resources readily available to employees. Hotels and hotel brands can and should mandate that all staff working at all hotel properties complete anti human trafficking training.

83.     Hotels and hotel brands can and should encourage staff to report suspected incidents of human trafficking when observed on hotel properties.

84.     Hotels and hotel brands can and should develop and maintain relationships with law enforcement regarding appropriate and timely responses to suspected incidents of human trafficking on hotel properties.

85.     Hotels and hotel brands can and should post anti human trafficking awareness and informational materials in common areas and guest rooms to help eliminate human trafficking.

86.     Similarly, hotels and hotel brands can and should develop and maintain relationships with non-profit service providers in the field regarding appropriate human trafficking prevention training for hotel staff.

87.     The indicia of human trafficking and effective preventative measures are widely known and available to the hospitality industry and hotels and hotel brands that do not identify and report evidence of human trafficking on hotel properties do so in spite of the knowledge of that preventative training and resources are available, but they simply elect not to engage in preventative policies and practices.

88.     The motivation for this ongoing willful blindness and ongoing failure to act within the hospitality industry is plain and simple—limitless corporate greed. Hotels and hotel brands, knowing both the obvious dangers and the remedial safety precautions associated with human trafficking, nevertheless ignored both the signs of and solutions to human trafficking out of an unfettered fealty to their profit margins and a corresponding complete disregard for the value of human life.

### The Hospitality Industry's Unwillingness To Stop Sex Trafficking

89.     By repeatedly failing to heed the call or repeatedly failed to execute their own policies, hotels, such as Defendants, continue to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

90.     Indeed, the implementation of anti-trafficking measures is in conflict with a hotel's revenue objectives – constant and full hotel occupancy.

91.     Upon information and belief, the hotels and their agents, lobbied through local, state and federal against antitrafficking policies.

92.     Due to the failure to act, hotels are facilitating and enabling sex traffickers to use hotels for sex trafficking, and traffickers and "Johns" continue to capitalize on Defendants' failure to timely and effectively act. A hotel's failure to prevent and stop sex trafficking and sexual exploitation effectively makes them accountable to victims of sex trafficking, and Defendants are no exception.[11]

---

[11]  As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."

## THE SEX TRAFFICKING OF S.Y. AND C.S.

93.     Commencing sometime in approximately 2013, S.Y. was recruited, enticed, solicited, held, harbored as captive and/or arranged for transport to the Defendants' hotels by their sex traffickers to engage in commercial sex acts at the Defendants' hotels on a regular, consistent and/or repeated basis.

94.     Commencing sometime in approximately 2014, C.S. was recruited, enticed, solicited, held, harbored as captive and/or arranged for transport to the Defendants' hotels by their sex traffickers to engage in commercial sex acts at the Defendants' hotels on a regular, consistent and/or repeated basis.

95.     At all times material to this Complaint, all Defendants received monetary payment for the rental of rooms to the Plaintiffs and their captors, as well as any food and drink revenue and ATM fees.

96.     At all material times, the Defendants, individually and/or by and through their actual or apparent agents, servants, franchisees and/or employees regularly rented or otherwise provided, for their own benefit, rooms and services at the hotel to the Plaintiffs' sex traffickers.

97.     The Plaintiffs were forced to engage in sexual activities within and on the Defendants' premises.

98.     Defendants' agents and employees made promises to the Plaintiffs' sex traffickers to not interfere with the Plaintiffs who were victims of human sex trafficking and slavery.

99.     The human sex trafficking enterprise was run out of the Defendants' hotels as follows:

        a.  The Plaintiffs' sex traffickers put up internet advertisements for the purpose of prostituting the Plaintiff. At least 82 ads on Backpage.com have been identified. Said advertisements would include a phone number, which would ring to their cell

telephone. During the telephone call, sex for cash was negotiated and the caller "John" would be informed that the Plaintiffs were at the Defendants' hotels.

b.  The caller "John" who negotiated for the Plaintiffs' sex services would then appear on the Defendants' hotel premises and either the Plaintiffs would meet the "John" in the lobby to escort the "John" to their rooms, or the "John" would speak to the staff at the Defendants' hotels to inquire about the Plaintiffs' room numbers or otherwise direct the "John" to the Plaintiffs' room.

c.  While the Plaintiffs performed sex acts with the "John" in the room, the Plaintiffs' sex traffickers would linger in the halls and on the premises of the Defendants' hotels.

d.  The "John" paid the Plaintiffs in cash in exchange for the commercial sex acts received in the hotel room. The Plaintiffs gave the cash received for the commercial sex acts to their traffickers.

e.  In turn, the Plaintiffs' sex traffickers, used said cash as payment for the hotel rooms where commercial sex acts continued to take place, thereby benefitting the occupancy rates and the Defendants financially.

f.  The Plaintiffs' sex traffickers also engaged in the commercial sale of illegal drugs on the Defendants' premises with sales taking place either in their hotel rooms or in public areas of the hotels.

100.    The Plaintiffs performed numerous commercial sex acts ("dates") per day while at the Defendants' hotels. As such, the foregoing routine occurred on the premises numerous times in a 24-hour window.

101.    Upon information and belief, some of the "Johns" visiting the Plaintiffs while on the Defendants premises, were staff, agents and/or employees of the Defendants.

102.    The Plaintiffs' sex traffickers, through the Plaintiffs and other agents, conducted multiple illegal drug sales throughout the day on the Defendants' premises in adjoining rooms.

103.    The following was also routine conduct taking place on the Defendants' premises as a result of the human sex trafficking enterprise:

a. The Plaintiffs' sex traffickers frequently rented the rooms all close to each other;

b. The Plaintiffs' sex traffickers paid cash for the Defendants' hotel rooms where the Plaintiffs engaged in commercial sex acts;

c. The Plaintiffs' sex traffickers would book extended stays at the Defendants' hotels for themselves and for the Plaintiffs on a routine basis and on a rotating basis frequently throughout the year;

d. The Plaintiffs and the Plaintiffs' sex traffickers would have few or no luggage or personal possessions for these extended stays;

e. The Plaintiffs were confined in the Defendants' hotel rooms for long periods of time;

f. The Plaintiffs' rooms and their sex traffickers' rooms consistently displayed "Do Not Disturb" signs on the doors to the room where the Plaintiffs were engaged in commercial sex acts;

g. Men ("Johns") frequently entered and left the Defendants' hotel rooms where the Plaintiffs were engaged in illegal commercial sex acts at all times of day and night;

h. The Defendants' staff and customers reported to the Defendants' administration that the rooms where the Plaintiffs engaged in commercial sex acts were messy, and contained sex and drug paraphernalia and had an unclean smell;

    i.  The Defendants' hotel rooms were stained with the Plaintiffs' blood after they were beaten or violently raped;

    j.  The Plaintiffs' sex traffickers consistently refused housekeeping services and otherwise would prohibit staff from entering their rooms and the Plaintiffs' rooms;

    k.  The Plaintiffs would frequently request clean towels and linens;

    l.  The Plaintiffs dressed in a sexually explicit manner and would walk the hallways of the Defendants' hotels;

    m.  Excessively loud noises would consistently come from Plaintiffs' rooms;

    n.  During nighttime hours, the Plaintiffs and their "Johns" and drug clients would create noise in the public area of the Defendants' hotels and, upon information and belief, would be a disturbance to other guests using the hotels for their intended purposes;

    o.  The Plaintiffs would sleep during the day and the Defendants' staff members would consistently see the Plaintiffs wearing lounge or sleep type clothing during the day; and

    p.  While at the Defendants' hotels, the Plaintiffs displayed clear signs of physical abuse, diminished personal hygiene, submissiveness and inappropriate attire.

104.    Upon information and belief, while at the Defendants' hotels, the Plaintiffs were forced to engage in frequent use of illegal hard drugs and would exhibit behavior consistent with someone who was under the influence, or near overdose, of a chemical substance.

105.    In addition, the Defendants knew or should have known that:

a. Women, including Plaintiffs, were walking around with cuts, lacerations, abrasions, bruises, injuries and bandages, including all over their faces;

b. Women walked around hotel strung out on drugs for days at a time;

c. Women looked tired and haggard due to forced sex work at all hours of the day for many days at a time;

d. Women were dressed inappropriately for the location and weather;

e. The same women walking in lobby 9-10 times a day with different men (would meet "Johns" at front door); and

f. The Collier County Sheriff Office ("CCSO") would come, knock on doors and tell girls and men to leave; CCSO would follow them to next hotel.

106.    The Defendants knew or should have known of the dangerous conditions on their premises that was likely to cause harm to the Plaintiff, in the following ways:

a. Defendants' hotels were not properly designed for guest safety and proper monitoring by staff and surveillance systems;

b. Presence of suspicious people;

c. Random people coming in and out of certain room each night to have sex and buy drugs;

d. Rooms routinely filled with about 10 people who engaged in sex and drugs;

e. Loud, boisterous sounds and music in the rooms and public areas throughout the night and day disturbed the quiet enjoyment of other guests;

f. Women and clients would go into hotel parking lot and loiter;

g.  Upon alert by other hotel customers and/or staff of Defendants, the CCSO received emergency calls that prostitution was occurring at Defendants' hotel in the rented rooms of the Plaintiffs' sex traffickers and/or the Plaintiffs;[12]

h.  Emergency medical technicians from the City of Naples were frequently called to  Defendants' hotel premises for drug overdoses and/or injuries occurring in Defendants' hotel rooms that were rented to the Plaintiffs' sex traffickers and/or the Plaintiff; and

i.  Defendants knew or should have known there was a foreseeable increased risk that illegal sex trafficking was occurring, and that the Plaintiffs might be harmed. Further that the scope of the anticipated risk to which the Defendants allowed the Plaintiffs to be exposed and the Plaintiffs were within the zone of risks that were reasonably foreseeable by the Defendants.

107.    The foregoing routine and conduct occurred from 2013 through early 2016. Naples Police were cognizant of it from afar, making it impossible for each Defendant to be ignorant of what was occurring right in front of them.

108.    In fact, as early as the Fall of 2015, CCSO had established routine patrols to check local hotels (including Defendants' hotels) for human sex trafficking activities.

109.     As such, at all material times, Defendants individually and/or by and through their actual or apparent agents, servants, franchisees and/or employees were uniquely positioned to observe the manifestations or indications of human sex trafficking and human sex trafficking victims within the Defendants' hotels where they worked.

---

[12] Upon information and belief CCSO was present on Defendants' hotel premises on multiple times during the relevant times.

110.    The Defendants individually and/ or by their actual or apparent agents, servants, franchisees and/or employees knew or had constructive knowledge, that they were renting or otherwise providing rooms and services to individuals, such as human sex trafficker, who were engaged in the commercial sex trade.

111.    The Defendants individually and/or by their actual or apparent agents, servants, franchisees and/or employees, knew or had constructive knowledge, that the women with Plaintiffs' sex traffickers, such as Plaintiffs S.Y. and C.S., were used to carry out the commercial sex trade and sale of illegal drugs.

112.    The Defendants individually and/or by their actual or apparent agents, servants, franchisees and/or employees knew or should have known of suspicious activity and that by failing to inspect and make their hotel premises safe from criminal activity, it was foreseeable that illegal activity was, and would continue to be, carried out on their premises, It follows then that as hoteliers, the Defendants could reasonably foresee that sex crimes, human trafficking or other foreseeable acts were occurring on their premises and/or were being committed against hotel guests, such as the Plaintiffs.[13]

113.    The Defendants individually and/or by their actual or apparent agents, servants, franchisees and/or employees, knew or had constructive knowledge that the sale and usage of illegal drugs were being performed on the premises.

114.    Moreover, the Defendants' hotel housekeeping, front desk, maintenance, food preparation staff, managers, and pool staff had conversations with the Plaintiffs, and had knowledge, or should have had knowledge, that the Plaintiffs were staying at the hotel for an

---

[13] The Plaintiffs do not allege that the Defendants intended the *injurious* result – the Plaintiffs' permanent bodily and mental harm from sexual exploitation – but rather the Plaintiffs allege that the Defendants knew or should have known of a dangerous condition existed and that by *failing to act* to prevent and make their hotel premises safe that such *failure to act* could foreseeably harm the Plaintiffs or other guests from sexual exploitation.

extended period of time to carry-out various sex trafficking ventures. The Defendants' hotel staff also knew that the Plaintiffs would routinely sleep during the day and walk the premises at night in provocative attire.

**Defendants Knowingly Benefitted From S.Y. and C.S. Sex Trafficking**

115.    At all material times the Defendants received money and financially profited from the forced commercial sex acts that were being carried out by the Plaintiffs on the premises of the Defendants' hotels.

116.    Defendants knew or should have known that they were financially profiting from the continuation of illegal commercial sex acts committed on their premises through both renting of rooms and provision of the Plaintiffs' forced commercial sex services.

117.    Despite knowledge, constructive knowledge and general awareness of the signs of human trafficking, the Defendants, individually and / or by and through their actual or apparent agents, servants, franchisees and/or employees failed to report to authorities, intervene, disrupt, refuse or otherwise stop the human sex trafficking of the Plaintiff.

118.    By harboring the Plaintiffs' sex traffickers and the Plaintiffs' commercial sex and drug acts, the Defendants, by and through their actual or apparent agents, servants, franchisees and/or employees, continued to financially profit from the room occupancy derived from not reporting and not refusing the human sex trafficking of the Plaintiff.

119.    Accordingly, the Defendants continued to financially profit from the room occupancy derived from not protecting their hotel guests, to wit the Plaintiff, from being a continuous victim of human sex trafficking.

**Franchisor-Franchisee Revenue**

120.    The hospitality industry is composed of several large hoteliers, namely, Defendants IHG, Wyndham, Choice, Marriott, Best Western.

121.    IHG, Wyndham, Choice, Marriott and Best Western derive a large portion of their revenue from a franchised business model.

122.    The Defendants are well aware of their role and responsibility in human sex trafficking. They eventually chose to create anti-trafficking policies and they trained and educated both their corporate employees and their franchise brands of these policies and established systems to enforce the policies.

123.    IHG, Wyndham, Choice, Marriott and Best Western lend their name and likeness to third party owners. A typical franchise business model is where the building and operations are run by a franchisee or third party management company under the brands' control, although in some cases, the hotel brand may offer a modified franchise model where the hotel brand actually manages the franchised hotel on behalf of third-party hotel owners.[14] In return, the parent brand, here IHG, Wyndham, Choice, Marriott and Best Western, receive a significant franchise fee and continuous royalties on the franchise property's gross revenue, and exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract or membership agreement while still profiting from putting heads in beds.

124.    Upon information and belief, IHG, Wyndham, Choice, Marriott and Best Western retain significant control of their franchised business. This control includes, but is not limited to the areas of:

   a.   Employee training;

   b.   Standardized strict rules governing business operations;

   c.   Hotel marketing and branding;

   d.   Prices for hotel rooms and amenities;

---

[14] https://www.sec.gov/Archives/edgar/data/858446/000119312517066763/d286710d20f.htm

     e.   Requirement for regular inspection;

     f.   Online booking platforms;

     g.   Rewards programs;

     h.   Employee compensation and benefits; and

     i.   Building and maintenance of hotel facilities;

125.    Upon information and belief, the franchise hotels, here the Best Western, Quality Inn, Comfort Inn, Days Inn, Holiday Inn Express, Staybridge Suites, Residence Inn, La Quinta Inn, Super 8, and Ramada typically pay around 10% of their total [room] revenue back to the parent hotel brand.

126.    However, the average consumer does not see this franchise relationship.  The parent brand gives the franchisee property its entire identity.  It provides signage on and in front of the building that assures customers that if they check into that hotel, they can expect the standards consistent with the parent hotel brand.  The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

127.    In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website.  This is so that booking and room reservations, the source of profits for the entire industry, are controlled by the corporate parent brand.

128.    Franchisees are required to attend the franchise hotel's training programs and workshops prior to commencing operations, and every manager or director is typically required to complete a certification course. In addition, the franchisor's employees will provide on-site consulting and/or

training visit(s) to the Hotel each year, as well as program services and training required to open a new franchise hotel in the System. During the term of the franchise agreement, the franchisor will also provide required and optional continuing training programs.

129.    For example, IHG Hotels "require[s] owners to operate in compliance with all applicable laws and regulations and expect owners to conduct their business in an ethical manner. To assist franchisees in meeting this expectation, IHG makes various resources available including human rights training and guidance, and is committed to working with and encouraging [its] owners and franchisees to prevent, mitigate and address adverse impacts on human rights, including modern slavery." [15]

130.    Per the franchise agreement, the parent brand may enforce these standards through periodic audits, inspections, and termination of the franchise agreement if the franchise hotel is found to be inadequate.   The right of the parent hotel brand to enforce their brand standards is also their responsibility.

131.    At the time of the incidents alleged herein:

    a.   Defendant Best Western owned and controlled the Best Western brand.

    b.   Defendant Choice Hotels owned and controlled the Quality Inn brand and the Comfort Inn brand.

    c.   Defendants IHG Hotels owned and controlled the Holiday Inn Express brand and the Staybridge Suites brand.

    d.   Defendants Marriott Hotels owned and controlled the Residence Inn brand.

---

[15]    https://www.ihgplc.com/-/media/ihg/files/responsible-business/2018-responsible-business/downloads/2019/2019-mss/ihg-modern-slavery-statement-2019-final.pdf?la=en&hash=F9F8DEBCFB4130F012FCF9C90C88E39D

e. Defendants Wyndham Hotels owned and controlled the La Quinta brand, Days Inn brand, Ramada brand and the Super8 brand.

132.    While parent hotel brands, the franchisor, may kick delinquent hotels out of their system, they seldom do because it is at the expense of terminating their royalty payments. Even an inadequate or dangerous hotel under the parent hotel brand's flag generates more revenue than no hotel.

### Defendants' Willful Blindness to Sex Trafficking at their Hotels

133.    Today, IHG, Wyndham, Choice, Marriott and Best Western have some statement buried in their website's footer about their "human rights" policy, it is vague, incomplete and otherwise smoke and mirrors.

134.    Defendants Gulfcoast Inn, Best Western Naples Plaza, Quality Inn Choice Hotels, Comfort Inn Choice Hotels, Days Inn Wyndham Hotels, Holiday Inn Express IHG, Staybridge IHG, Residence Inn Marriott, La Quinta Wyndham Hotels, Super 8 Wyndham, Ramada Wyndham, Garden Inn, Spinnaker, Sunrise Motel, Conty's Motel, Glades Motel, Inn of Naples, Fairways Inn, Parkshore Resorts and Sea Shell. Motel have all been on constructive or actual notice [16] of repeated incidences of sex trafficking occurring at their hotel, motel or public lodging establishment, yet all these Defendants and their owners, brand managers, operators and agents failed to take the necessary action to prevent sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

135.    The Plaintiffs were paying hotel guests on the Defendants' properties and Plaintiffs were seriously and permanently injured as a direct result of the Defendants' acts and omissions, in that the Defendants permitted, harbored and facilitated illegal sex trafficking ventures to take place on

---

[16] By virtue of membership in AAOHO or ALHA, incidents on the premises, observations and evidence on the premises,  incidents at nearby properties, news reports, industry reports, customer reviews or otherwise.

their premises whereby the Plaintiffs were routinely and continuously abused, battered, falsely imprisoned, raped, beaten, starved, forcibly injected with drugs and enslaved.

136.    More specifically, at all material times, in the quest for profits, the Defendants' acts and omissions caused the Plaintiffs to suffer:

   j. Forced labor;

   k. Forced confinement without safe means of escape;

   l. Assault and fear;

   m. Sickness, dizziness and headaches;

   n. Cuts, lacerations, abrasions and other physical harm;

   o. Property damage;

   p. Mental anguish, humiliation, exploitation, degradation and mental distress;

   q. Suffocation, battery and rape;

   r. Shock, fright and post-traumatic stress;

   s. Overdose and drug-induced dangers (the Plaintiffs suffered drug overdoses, drug-induced actions which caused harm to themselves, physical deformities and scarfing from actions of the "Johns" and drug usage); and

   t. Invasion of privacy and wrongful entry of "Johns."

**<u>TRAFFICKING OF S.Y. AND C.S AT THE GULFCOAST INN</u>**

137.    The Gulfcoast Inn has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

138.    Defendant Gulfcoast Inn knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

139.    As early as 2013, multiple arrests for prostitution were made at the Gulfcoast Inn and the CCSO knew about continuing incidences of sex trafficking and drug use at the property.

140.    Upon information and belief, from approximately 2015 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs), Keith Lewis (aka Big Mike), and by others at the Gulfcoast Inn.

141.    The Plaintiffs were repeatedly seen by hotel staff after being drugged and forced to wear inappropriate attire around the hotel property and the hotel pool.

142.    The Plaintiffs were forced to meet men by the pool at the Gulfcoast Inn and were able to enter their rooms through outside doors.

143.    The rooms Plaintiffs were held in at the Gulfcoast inn were frequented by up to 20 men per day and were littered with drugs and drug paraphernalia.

144.    At one point, the Plaintiffs witnessed another person overdose at the Gulfcoast Inn, and trafficker Keith Lewis punched out a glass door to come in and help the woman who overdosed. Upon information and belief, the Gulfcoast Inn never reported this overdose incident or any other incident related to sex trafficking to authorities.

145.    The trafficking activities at the Gulfcoast Inn were obvious and observed to the CCSO, guests, and hotel staff.

146.    Gulfcoast Inn failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S. Y. and C. S. from being sex trafficked.

147.    Defendants Gulfcoast Inn knew or should have known that the Gulfcoast Inn Naples hotel where Plaintiffs S.Y. and C.S. were trafficked was an area known for high incidence of crime and

prone to sex trafficking activity on and around the hotel premises, including when Plaintiffs S.Y. and C.S. were trafficked.

148.     Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendants Gulfcoast Inn repeatedly failed to stop these actions.

149.     Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

150.     For years, Defendant Gulfcoast Inn has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

151.     The acts and omissions of Gulfcoast Inn served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation

by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AT THE BEST WESTERN NAPLES PLAZA

152.   The Best Western Naples Plaza has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

153.   Defendant Best Western Naples Plaza knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

154.   Upon information and belief, from approximately 2015 to 2016, S.Y. was trafficked by Gregory Hines (aka Bowlegs), Keith Lewis, and by others at the Best Western Naples Plaza.

155.   The traffickers rented a room at the hotel at a time when the hotel was partially under construction. At no time did any employee of Best Western check on the room or its occupants so the traffickers kept S.Y. in the room well beyond the original room rental.

156.   Plaintiffs room was frequented by many men on a daily basis and was always littered with drugs and drug paraphernalia.

157.   If the Best Western Naples Plaza staff had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

158.   Upon information and belief, at the time of the incidents alleged herein, Defendant Best Western International, Inc. was in an agency relationship with Defendants R&M Real Estate Co. Inc. and Robert Vocisano.

159.   Defendant Best Western International, Inc. exercised ongoing and systematic control over operations sufficient to establish an agency relationship with Defendants R&M Real Estate Co. Inc. and Robert Vocisano.

160.    Defendant Best Western International, Inc. exercised control over the means and methods of how Defendants R&M Real Estate Co. Inc. and Robert Vocisano conducted business through one or more of the following actions:

      a.   Hosting online bookings on Best Western's domain;

      b.   Requiring Best Western branded hotels to use Best Western's customer rewards program;

      c.   Setting employee wages;

      d.   Making employment decisions;

      e.   Advertising for employment;

      f.   Sharing profits;

      g.   Standardized training methods for employees;

      h.   Building and maintaining the facility in a manner specified by the owner;

      i.   Standardized or strict rules of operation;

      j.   Regular inspection of the facility and operation by owner;

      k.   Fixing prices; or

      l.   Other actions that deprive Defendants R&M Real Estate Co. Inc. and Robert Vocisano of independence in business operations.

161.    An apparent agency relationship also existed between Defendant Best Western International, Inc. and Defendants R&M Real Estate Co. Inc. and Robert Vocisano. Defendant Best Western International, Inc. represented to the public that it had authority to act on behalf of Best Western branded hotels.

162.    Defendant Best Western International, Inc. failed to address and prevent human trafficking at its Best Western branded hotels in the following ways:

a.   Failed to adequately distribute information to assist employees in identifying human trafficking;

b.   Failed to provide a process for escalating human trafficking concerns within the organization;

c.   Failed to mandate managers, employees, or owners attend training related to human trafficking;

d.   Failed to provide new hire orientation on human rights and corporate responsibility;

e.   Failed to provide. Training and education on human trafficking through webinars, seminars, conferences, and online portals;

f.   Failed to develop and hold or require ongoing training sessions on human trafficking; or

g.   Failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

163.   The Defendants R&M Real Estate Co. Inc. and Robert Vocisano are alter egos, representatives, agents, or coconspirators of Defendant Best Western International, Inc. Defendant Best Western International, Inc. exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Defendants R&M Real Estate Co. Inc. and Robert Vocisano.

164.   They are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the hotel where the Plaintiff was trafficked for sex. The Best Western Naples Plaza Defendants each share the common policies and practices complained of herein.

165. The Best Western Naples Plaza Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

166. As an integrated enterprise and or joint employer, The Best Western Naples Plaza Defendants are separately and jointly responsible for compliance with all applicable laws.

167. As an integrated enterprise and or joint employer, The Best Western Naples Plaza Defendants are jointly and severally liable for any damages caused by employees.

168. Best Western Naples Plaza failed to implement and enforce any of its own policy or policies and protect Plaintiffs S. Y. and C. S. from being sex trafficked.

169. Defendants Best Western Naples Plaza knew or should have known that the Best Western Naples Plaza hotel where Plaintiffs S.Y. and C.S. were trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiffs S.Y. and C.S. were trafficked.

170. Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendants Best Western Naples Plaza repeatedly failed to stop these actions.

171. Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and

suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

172.    For years, Defendant Best Western Naples Plaza has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

173.    The acts and omissions of Best Western Naples Plaza served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE QUALITY INN CHOICE HOTELS

174.    The Quality Inn Choice Hotels has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

175.    Defendant Quality Inn Choice Hotels knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

176.    Upon information and belief, from approximately 2014 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs), Keith Lewis, and by others at the Quality Inn Choice Hotels.

177.    The traffickers worked with Defendant Quality Inn Choice Hotels to always rent a room in the tower to the left of the front entrance so they could more easily engage in trafficking.

178.    The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

179.    On one occasion, S.Y. was found unresponsive by housekeeping and was transported to Physician Regional Hospital by EMS. Despite this incident, Quality Inn Choice Hotels continued to rent rooms to the traffickers and did not help S.Y. when she appeared back at the property and was again being trafficked.

180.    If the Quality Inn Choice Hotels staff had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

181.    Upon information and belief, at the time of the incidents alleged herein, Defendant Choice Hotels International, Inc. was in an agency relationship with Defendant Robert Vocisano.

182.    Defendant Choice Hotels International, Inc. exercised ongoing and systematic control over operations sufficient to establish an agency relationship with Defendant Robert Vocisano.

183.    Defendant Choice Hotels International, Inc. exercised control over the means and methods of how Defendant Robert Vocisano conducted business through one or more of the following actions:

    a.  Hosting online bookings on Choice Hotel's domain;

    b.  Requiring Choice Hotels branded hotels to use Choice Hotel's customer rewards program;

    c.  Setting employee wages;

    d.  Making employment decisions;

    e.  Advertising for employment;

    f.  Sharing profits;

    g.  Standardized training methods for employees;

    h.  Building and maintaining the facility in a manner specified by the owner;

    i.  Standardized or strict rules of operation;

    j.  Regular inspection of the facility and operation by owner;

    k.  Fixing prices; or

    l.  Other actions that deprive Defendants Robert Vocisano of independence in business operations.

184.    An apparent agency relationship also existed between Defendant Choice Hotels International, Inc. and Defendant Robert Vocisano. Defendant Choice Hotels International, Inc. represented to the public that it had authority to act on behalf of Choice branded hotels.

185.    Defendant Choice Hotels International, Inc. failed to address and prevent human trafficking at its Quality Inn Choice branded hotels in the following ways:

    a.  Failed to adequately distribute information to assist employees in identifying human trafficking;

    b.  Failed to provide a process for escalating human trafficking concerns within the organization;

    c.  Failed to mandate managers, employees, or owners attend training related to human trafficking;

    d.  Failed to provide new hire orientation on human rights and corporate responsibility;

    e.  Failed to provide. Training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f.  Failed to develop and hold or require ongoing training sessions on human trafficking; or

g.  Failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

186.   The Quality Inn Choice Hotel Defendants are alter egos, representatives, agents, or coconspirators. Defendant Choice Hotels International, Inc. exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Defendant Robert Vocisano.

187.   They are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the hotel where the Plaintiff was trafficked for sex. The Quality Inn Choice Hotel Defendants each share the common policies and practices complained of herein.

188.   The Quality Inn Choice Hotel Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

189.   As an integrated enterprise and or joint employer, The Quality Inn Choice Hotel Defendants are separately and jointly responsible for compliance with all applicable laws.

190.   As an integrated enterprise and or joint employer, The Quality Inn Choice Hotel Defendants are jointly and severally liable for any damages caused by employees.

191.   Quality Inn Choice Hotels failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S. Y. and C. S. from being sex trafficked.

192.   The Quality Inn Choice Hotel Defendants knew or should have known that the Quality Inn Choice Hotel where Plaintiffs S.Y. and C.S. were trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiffs S.Y. and C.S. were trafficked.

193.     Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendants Quality Inn Choice Hotels repeatedly failed to stop these actions.

194.     Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

195.     For years, Defendant Quality Inn Choice Hotels has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

196.     The acts and omissions of Quality Inn Choice Hotels served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE COMFORT INN CHOICE HOTELS

197.    The Comfort Inn Choice Hotels has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

198.    Defendant Comfort Inn Choice Hotels knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

199.    Upon information and belief, from approximately 2015 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs), William Day, Anthony Baratta, and by others at the Comfort Inn Choice Hotels.

200.    The traffickers worked with Defendant Comfort Inn Choice Hotels to typically rent two adjoining rooms (often times Rooms 318 and 320) paid for by Anthony Barratta but put in the Plaintiff's names.

201.    According to the CCSO, the Comfort Inn Choice Hotel is located in a high crime area commonly known for suspicious activity, drugs, and prostitution.

202.    Comfort Inn Choice Hotel permitted the entire trafficking group to take drugs in their cars in the hotel parking lot and on the balcony.

203.    The Plaintiffs would frequently be seen on balconies with inappropriate attire or no clothes at all and they took no action.

204.    The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

205.    If the Comfort Inn Choice Hotels staff had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

206.    Upon information and belief, at the time of the incidents alleged herein, Defendant Choice Hotels International, Inc. was in an agency relationship with Defendant R&M Real Estate Company, Inc.

207.    Defendant Choice Hotels International, Inc. exercised ongoing and systematic control over operations sufficient to establish an agency relationship with R&M Real Estate Company, Inc..

208.    Defendant Choice Hotels International, Inc. exercised control over the means and methods of how R&M Real Estate Company, Inc. conducted business through one or more of the following actions:

    a.   Hosting online bookings on Choice Hotel's domain;

    b.   Requiring Choice Hotels branded hotels to use Choice Hotel's customer rewards program;

    c.   Setting employee wages;

    d.   Making employment decisions;

    e.   Advertising for employment;

    f.   Sharing profits;

    g.   Standardized training methods for employees;

    h.   Building and maintaining the facility in a manner specified by the owner;

    i.   Standardized or strict rules of operation;

    j.   Regular inspection of the facility and operation by owner;

    k.   Fixing prices; or

    l.   Other actions that deprive R&M Real Estate Company, Inc. of independence in business operations.

209.    An  apparent  agency  relationship  also  existed  between  Defendant  Choice  Hotels International, Inc. and R&M Real Estate Company, Inc.. Defendant Choice Hotels International, Inc. represented to the public that it had authority to act on behalf of Choice branded hotels.

210.    Defendant  Choice  Hotels  International,  Inc.  failed  to  address  and  prevent  human trafficking at its Comfort Inn Choice branded hotels in the following ways:

   a.  Failed  to  adequately  distribute  information  to  assist  employees  in  identifying human trafficking;

   b.  Failed to provide a process for escalating human trafficking concerns within the organization;

   c.  Failed to mandate managers, employees, or owners attend training related to human trafficking;

   d.  Failed to provide new hire orientation on human rights and corporate responsibility;

   e.  Failed to provide. Training and education on human trafficking through webinars, seminars, conferences, and online portals;

   f.  Failed  to  develop  and  hold  or  require  ongoing  training  sessions  on  human trafficking; or

   g.  Failed  to  provide  checklists,  escalation  protocols  and  information  to  property management staff or tracking performance indicators and key metrics on human trafficking prevention.

211.    The  Comfort  Inn  Choice  Hotel  Defendants  are  alter  egos,  representatives,  agents,  or coconspirators. Defendant Choice Hotels International, Inc. exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Defendant R&M Real Estate Company, Inc..

212.    They are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the hotel where the Plaintiff was trafficked for sex. The Comfort Inn Choice Hotel Defendants each share the common policies and practices complained of herein.

213.    The Comfort Inn Choice Hotel Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

214.    As an integrated enterprise and or joint employer, The Comfort Inn Choice Hotel Defendants are separately and jointly responsible for compliance with all applicable laws.

215.    As an integrated enterprise and or joint employer, The Comfort Inn Choice Hotel Defendants are jointly and severally liable for any damages caused by employees.

216.    Comfort Inn Choice Hotels failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S. Y. and C. S. from being sex trafficked.

217.    The Comfort Inn Choice Hotel Defendants knew or should have known that the Quality Inn Choice Hotel where Plaintiffs S.Y. and C.S. were trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiffs S.Y. and C.S. were trafficked.

218.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendants Comfort Inn Choice Hotels repeatedly failed to stop these actions.

219.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v)

providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

220.    For years, Defendant Comfort Inn Choice Hotels has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

221.    The acts and omissions of Comfort Inn Choice Hotels served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

### TRAFFICKING OF S.Y. AND C.S AT THE WYNDHAM HOTEL PROPERTIES

222.    The Days Inn Wyndham Hotel, La Quinta Wyndham Hotel, Super 8 Wyndham, and Ramada Wyndham have been on notice of repeated incidences of sex trafficking occurring on its properties, yet have failed to take the necessary actions to prevent sex trafficking from taking place.

223.    These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

224.     In 2011, Wyndham Hotels and Resorts Inc.'s predecessor entity, Wyndham Worldwide Corporation, Signed the Tourism Child-Protection Code of Conduct yet only trained some of its employees to look for signs of trafficking.[17]

225.     Upon information and belief, from approximately 2015 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs), Keith Lewis (aka Big Bike), and by others at the Days Inn Wyndham Hotels.

226.     During the relevant period, CCSO conducted surveillance at the property and observed obvious sex trafficking activities taking place in the open.

227.     The traffickers would constantly leave "do not disturb" signs on the door to hotel rooms 111 and 113 where the Plaintiffs were being trafficked.

228.     Days Inn Wyndham Hotel Manager "Kurt" participated directly in trafficking activity while he was working for the Defendants by paying the traffickers to have forced sex with the Plaintiffs.

229.     The Plaintiffs were tortured and raped in their rooms and in the laundry room at the property.

230.      The rooms Plaintiffs were held in were filled with evidence of sex trafficking and drug use.

231.     Despite police surveillance, police raids, overdoses requiring EMS response, a constant flow of men walking past the front desk to get to the Plaintiffs' rooms, and Defendant's own hotel

---

[17] End Child Prostitution and Trafficking (ECPAT-USA) launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.  The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

manager participating directly in the trafficking of the Plaintiffs, Defendant Days Inn Wyndham

Hotels did not take appropriate actions to stop the sex trafficking or prevent further sex trafficking.

232.    From 2015 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs) and

Keith Lewis (aka Big Bike) at the La Quinta Wyndham Hotel properties.

233.    During the relevant time period, sex trafficking activities and drug use were conducted in

the open at Defendants' properties.

234.    The rooms Plaintiffs were held in were filled with evidence of sex trafficking and drug

use.

235.    From 2014 to 2016, S.Y. was trafficked by Gregory Hines (aka Bowlegs) and Keith Lewis

(aka Big Bike) at the Super 8 Wyndham.

236.    The Super 8 Wyndham had a known history of criminal activity.

237.    The traffickers would rent multiple rooms – one to be used for sex trafficking and the other

to be used for drug sales.

238.    Super 8 Wyndham staff observed sex trafficking out in the open, drug use out in the open,

and injured victims wandering the halls at all hours. At no time the staff at Super 8 Wyndham take

appropriate action to stop or prevent the sex trafficking activities from taking place.

239.    From 2015 to 2016 S.Y. was trafficked by Gregory Hines (aka Bowlegs) and Brandon

Guidry at the Ramada Wyndham.

240.    During the relevant time period, sex trafficking activities and drug use were conducted in

the open at Defendants' properties.

241.    The rooms Plaintiffs were held in were filled with evidence of sex trafficking and drug

use.

242.    If the staff at these Wyndham Hotel Properties had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

243.    Upon information and belief, at the time of the incidents alleged herein, Defendant Wyndham Hotels and Resorts, Inc. was in an agency relationship with Defendants Hanuman of Naples, LLC, Shree Siddhivinayak Hospitality, LLC, H.I. Naples, LLC, La Quinta Holdings, Inc., La Quinta Properties, Inc., Corepoint Lodging, Inc., CPLG, LLC, LQ FL Properties, LLC, CPLG FL Properties, LLC, Laxmi of Naples, LLC, and Rist Properties, LLC.

244.    Defendant Wyndham Hotels and Resorts, Inc.. exercised ongoing and systematic control over operations sufficient to establish an agency relationship Defendants Hanuman of Naples, LLC, Shree Siddhivinayak Hospitality, LLC, H.I. Naples, LLC, La Quinta Holdings, Inc., La Quinta Properties, Inc., Corepoint Lodging, Inc., CPLG, LLC, LQ FL Properties, LLC, CPLG FL Properties, LLC, Laxmi of Naples, LLC, and Rist Properties, LLC

245.    Defendant Wyndham Hotels and Resorts, Inc. exercised control over the means and methods of how Defendants Hanuman of Naples, LLC, Shree Siddhivinayak Hospitality, LLC, H.I. Naples, LLC, La Quinta Holdings, Inc., La Quinta Properties, Inc., Corepoint Lodging, Inc., CPLG, LLC, LQ FL Properties, LLC, CPLG FL Properties, LLC, Laxmi of Naples, LLC, and Rist Properties, LLC conducted business through one or more of the following actions:

       a.   Hosting online bookings on Wyndham Hotel's domain.;

       b.   Requiring Wyndham branded hotels to use Wyndham Hotel's customer rewards program;

       c.   Setting employee wages;

       d.   Making employment decisions;

       e.   Advertising for employment;

f.  Sharing profits;

g.  Standardized training methods for employees;

h.  Building and maintaining the facility in a manner specified by the owner;

i.  Standardized or strict rules of operation;

j.  Regular inspection of the facility and operation by owner;

k.  Fixing prices; or

l.  Other actions that deprive Defendants Hanuman of Naples, LLC, Shree Siddhivinayak Hospitality, LLC, H.I. Naples, LLC, La Quinta Holdings, Inc., La Quinta Properties, Inc., Corepoint Lodging, Inc., CPLG, LLC, LQ FL Properties, LLC, CPLG FL Properties, LLC, Laxmi of Naples, LLC, and Rist Properties, LLC of independence in business operations.

246.    An apparent agency relationship also existed between Defendant Wyndham Hotels & Resorts, Inc. and Defendants Hanuman of Naples, LLC, Shree Siddhivinayak Hospitality, LLC, H.I. Naples, LLC, La Quinta Holdings, Inc., La Quinta Properties, Inc., Corepoint Lodging, Inc., CPLG, LLC, LQ FL Properties, LLC, CPLG FL Properties, LLC, Laxmi of Naples, LLC, and Rist Properties, LLC..  Defendant Wyndham Hotels & Resorts, Inc. represented to the public that it had authority to act on behalf of Wyndham branded hotels.

247.    Defendant Wyndham Hotels & Resorts, Inc. failed to address and prevent human trafficking at its branded hotels in the following ways:

a.  Failed to adequately distribute information to assist employees in identifying human trafficking;

b.  Failed to provide a process for escalating human trafficking concerns within the organization;

59

    c.  Failed to mandate managers, employees, or owners attend training related to human trafficking;

    d.  Failed to provide new hire orientation on human rights and corporate responsibility;

    e.  Failed to provide. Training and education on human trafficking through webinars, seminars, conferences, and online portals;

    f.  Failed to develop and hold or require ongoing training sessions on human trafficking; or

    g.  Failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

248.    The Wyndham Hotel Defendants are alter egos, representatives, agents, or coconspirators. Wyndham Hotels & Resorts, Inc. exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Defendants Hanuman of Naples, LLC, Shree Siddhivinayak Hospitality, LLC, H.I. Naples, LLC, La Quinta Holdings, Inc., La Quinta Properties, Inc., Corepoint Lodging, Inc., CPLG, LLC, LQ FL Properties, LLC, CPLG FL Properties, LLC, Laxmi of Naples, LLC, and Rist Properties, LLC.

249.    They are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the hotel where the Plaintiff was trafficked for sex. The Wyndham Hotel Property Defendants each share the common policies and practices complained of herein.

250.    The Wyndham Hotel Property Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

251.    As an integrated enterprise and or joint employer, the Wyndham Hotel Property Defendants are separately and jointly responsible for compliance with all applicable laws.

252.    As an integrated enterprise and or joint employer, the Wyndham Hotel Property Defendants are jointly and severally liable for any damages caused by employees.

253.    The Wyndham Hotel Property Defendants failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S. Y. and C. S. from being sex trafficked.

254.    The Wyndham Hotel Property Defendants knew or should have known that the Hotels where Plaintiffs S.Y. and C.S. were trafficked were in areas known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiffs S.Y. and C.S. were trafficked.

255.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, the Wyndham Hotel Property Defendants repeatedly failed to stop these actions.

256.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing

steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

257.    For years, the Wyndham Hotel Property Defendants have failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

258.    The acts and omissions of the Wyndham Hotel Property Defendants Comfort Inn served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

### TRAFFICKING OF S.Y. AND C.S AT THE IHG HOTEL PROPERTIES

259.    The Holiday Inn Express IHG and Staybridge IHG have been on notice of repeated incidences of sex trafficking occurring on its properties, yet have failed to take the necessary actions to prevent sex trafficking from taking place.

260.    These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

261.    Upon information and belief, from approximately 2015 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs), Keith Lewis (aka Big Mike), and by others at the Holiday Inn Express IHG.

262.    During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' properties.

263.    The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

264.    From 2014 - 2015, S.Y. was trafficked by Jimmy Fischer at the Staybridge IHG hotel.

265.    During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' properties.

266.    The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

267.    If the staff at the IHG Hotel Properties had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

268.    Upon information and belief, at the time of the incidents alleged herein, Defendants Intercontinental Hotels Group, PLC and Intercontinental Hotels Group Resources, LLC was in an agency relationship with Defendants HIE Tollgate Blvd, LLC. and Naples CFC Enterprises, LTD.

269.    Defendants Intercontinental Hotels Group, PLC and Intercontinental Hotels Group Resources, LLC exercised ongoing and systematic control over operations sufficient to establish an agency relationship with Defendants HIE Tollgate Blvd, LLC. and Naples CFC Enterprises, LTD.

270.    Defendants Intercontinental Hotels Group, PLC and Intercontinental Hotels Group Resources, LLC exercised control over the means and methods of how Defendants HIE Tollgate Blvd, LLC. and Naples CFC Enterprises, LTD conducted business through one or more of the following actions:

    a.   Hosting online bookings on IHG Hotel's domain;

    b.   Requiring IHG branded hotels to use IHG's customer rewards program;

    c.   Setting employee wages;

    d.   Making employment decisions;

    e.   Advertising for employment;

    f.   Sharing profits;

    g.   Standardized training methods for employees;

    h.   Building and maintaining the facility in a manner specified by the owner;

    i.   Standardized or strict rules of operation;

    j.   Regular inspection of the facility and operation by owner;

    k.   Fixing prices; or

    l.   Other actions that deprive Defendants HIE Tollgate Blvd, LLC. and Naples CFC Enterprises, LTD of independence in business operations.

271.    An apparent agency relationship also existed between Defendants Intercontinental Hotels Group, PLC and Intercontinental Hotels Group Resources, LLC and Defendants HIE Tollgate Blvd, LLC. and Naples CFC Enterprises, LTD. Defendant Choice Hotels International, Inc. represented to the public that it had authority to act on behalf of Choice branded hotels.

272.    Defendants Intercontinental Hotels Group, PLC and Intercontinental Hotels Group Resources, LLC failed to address and prevent human trafficking at its IHG branded hotels in the following ways:

    a.   Failed to adequately distribute information to assist employees in identifying human trafficking;

    b.   Failed to provide a process for escalating human trafficking concerns within the organization;

    c.   Failed to mandate managers, employees, or owners attend training related to human trafficking;

    d.   Failed to provide new hire orientation on human rights and corporate responsibility;

    e.   Failed to provide. Training and education on human trafficking through webinars, seminars, conferences, and online portals;

f. Failed to develop and hold or require ongoing training sessions on human trafficking; or

g. Failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

273. The IHG Hotel Properties Defendants are alter egos, representatives, agents, or coconspirators Defendants Intercontinental Hotels Group, PLC and Intercontinental Hotels Group Resources, LLC. exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Defendants HIE Tollgate Blvd, LLC. and Naples CFC Enterprises, LTD .

274. They are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the hotel where the Plaintiff was trafficked for sex. The IHG Hotel Properties Defendants each share the common policies and practices complained of herein.

275. The IHG Hotel Properties Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

276. As an integrated enterprise and or joint employer, IHG Hotel Properties Defendants are separately and jointly responsible for compliance with all applicable laws.

277. As an integrated enterprise and or joint employer, IHG Hotel Properties Defendants are jointly and severally liable for any damages caused by employees.

278.  IHG Hotel Properties Defendants failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S. Y. and C. S. from being sex trafficked.

279.  IHG Hotel Properties Defendants knew or should have known that the Quality Inn Choice Hotel where Plaintiffs S.Y. and C.S. were trafficked was an area known for high incidence of crime

and prone to sex trafficking activity on and around the hotel premises, including when Plaintiffs S.Y. and C.S. were trafficked.

280.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, IHG Hotel Properties Defendants repeatedly failed to stop these actions.

281.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

282.    For years, IHG Hotel Properties Defendants have failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

283.    The acts and omissions of IHG Hotel Properties Defendants served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial

sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE RESIDENCE INN MARRIOTT

284.     The Residence Inn Marriott has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

285.     These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

286.     Upon information and belief, from approximately 2015 to 2016, S.Y. was trafficked by Gregory Hines (aka Bowlegs), Keith Lewis (aka Big Mike), and by others at the Residence Inn Marriott.

287.     During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' properties.

288.     The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

289.     If the staff at the Residence Inn Marriott had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

290.     Upon information and belief, at the time of the incidents alleged herein, Defendants Marriott International, Inc. and Residence Inn by Marriott was in an agency relationship with Defendants CSM RI Naples, LLC and CSM Corporation.

291.     Defendants Marriott International, Inc. and Residence Inn by Marriott exercised ongoing and systematic control over operations sufficient to establish an agency relationship with Defendants CSM RI Naples, LLC and CSM Corporation.

292.    Defendants Marriott International, Inc. and Residence Inn by Marriott exercised control over the means and methods of how Defendants CSM RI Naples, LLC and CSM Corporation. conducted business through one or more of the following actions:

    a.   Hosting online bookings on Marriott Hotel's domain;

    b.   Requiring Marriott branded hotels to use Marriott's customer rewards program;

    c.   Setting employee wages;

    d.   Making employment decisions;

    e.   Advertising for employment;

    f.   Sharing profits;

    g.   Standardized training methods for employees;

    h.   Building and maintaining the facility in a manner specified by the owner;

    i.   Standardized or strict rules of operation;

    j.   Regular inspection of the facility and operation by owner;

    k.   Fixing prices; or

    l.   Other actions that deprive Defendants CSM RI Naples, LLC and CSM Corporation of independence in business operations.

293.    An apparent agency relationship also existed between Defendants Marriott International, Inc. and Residence Inn by Marriott and CSM RI Naples, LLC and CSM Corporation. Defendants Marriott International, Inc. and Residence Inn by Marriott represented to the public that it had authority to act on behalf of Marriott branded hotels.

294.    Defendants Marriott International, Inc. and Residence Inn by Marriott failed to address and prevent human trafficking at its Marriott branded hotels in the following ways:

a. Failed to adequately distribute information to assist employees in identifying human trafficking;

b. Failed to provide a process for escalating human trafficking concerns within the organization;

c. Failed to mandate managers, employees, or owners attend training related to human trafficking;

d. Failed to provide new hire orientation on human rights and corporate responsibility;

e. Failed to provide. Training and education on human trafficking through webinars, seminars, conferences, and online portals;

f. Failed to develop and hold or require ongoing training sessions on human trafficking; or

g. Failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

295. The Residence Inn Marriott Defendants are alter egos, representatives, agents, or coconspirators.

296. Marriott International, Inc. and Residence Inn by Marriott exercises or has the right to exercise control over business operations, management, supervision, administration, and procedures of the Defendants CSM RI Naples, LLC and CSM Corporation.

297. They are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the hotel where the Plaintiff was trafficked for sex. The Residence Inn Marriott Defendants each share the common policies and practices complained of herein.

298.   The Residence Inn Marriott Defendants jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

299.   As an integrated enterprise and or joint employer, Residence Inn Marriott Defendants are separately and jointly responsible for compliance with all applicable laws.

300.   As an integrated enterprise and or joint employer, Residence Inn Marriott Defendants are jointly and severally liable for any damages caused by employees.

301.   Residence Inn Marriott Defendants failed to implement and enforce any of its own policy or policies and protect Plaintiff  S.Y. from being sex trafficked.

302.   Residence Inn Marriott Defendants knew or should have known that the Residence Inn Marriott hotel where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

303.   Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Residence Inn Marriott Defendants repeatedly failed to stop these actions.

304.   Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and

suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery; and (ix) ensure strict security protocols, credit cards only, and no loitering.

305.     For years, Residence Inn Marriott Defendants have failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

306.     The acts and omissions of Residence Inn Marriott Defendants served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE GARDEN INN

307.     The Garden Inn has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

308.     The Garden Inn has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

309.     These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

310.     Upon information and belief, from approximately 2014 to 2016, S.Y. was trafficked by Keith Lewis (aka Big Mike) and by others at the Garden Inn.

311.    During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' property.

312.    In addition to sex trafficking activities taking place at the Garden Inn, the Garden Inn was also used as a staging area by traffickers who forced S.Y. to conduct sex trafficking activities at neighboring residential trailers.

313.    The Plaintiff's room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

314.    If the staff at the Garden Inn had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

315.    Garden Inn failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S.Y. from being sex trafficked.

316.    Defendant Garden Inn knew or should have known that the Garden Inn where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

317.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Garden Inn repeatedly failed to stop these actions.

318.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of

enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

319.    For years, Defendant Garden Inn has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

320.    The acts and omissions of Garden Inn served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

### TRAFFICKING OF S.Y. AND C.S AT THE SPINNAKER

321.    The Spinnaker has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

322.    The Spinnaker has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

323.    These Defendants knew or should have known that pimps and sex traffickers used their hotel to facilitate the trafficking of women for sex.

324.   Upon information and belief, from approximately 2014 to 2016, S.Y. and C.S. were trafficked by various traffickers at the Spinnaker.

325.   During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' property.

326.   The Spinnaker permits hotel room rentals by the hour which is indicative of knowledge and promotion of sex trafficking activities taking pace at its property.

327.   The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

328.   If the staff at the Spinnaker had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

329.   The Spinnaker failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S.Y. and C.S. from being sex trafficked.

330.   Defendant Spinnaker knew or should have known that the Spinnaker hotel where Plaintiffs S.Y. and C.S. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. and C.S. were trafficked.

331.   Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Spinnaker repeatedly failed to stop these actions.

332.   Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all

employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

333.    For years, Defendant Spinnaker has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

334.    The acts and omissions of Spinnaker served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE SUNRISE MOTEL

335.    The Sunrise Motel has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

336.    The Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

337.    Upon information and belief, from approximately 2014 to 2015, S.Y. was trafficked by Jimmy Fischer and by others at the Sunrise Hotel.

338.     During the relevant time period, Jimmy Fischer negotiated a deal whereby he would pay double the standard room rate in cash in exchange for the Sunrise Motel to permit sex trafficking and other illegal activities to take place on the property.

339.     The Defendants knew the deal it had negotiated with Jimmy Fischer permitted sex trafficking and then witnessed the Plaintiff's room to be frequented by many men on a daily basis and the room also contained evidence of sex trafficking and drug use.

340.     If the staff at the Sunrise Motel had not negotiated a deal to permit trafficking, and had been trained to recognize the signs of sex trafficking, the trafficking of S.Y. at the Sunrise Motel would have been prevented.

341.     Sunrise Motel failed to implement and enforce any of its own policy or policies to protect Plaintiffs S.Y. from being sex trafficked.

342.     Defendant Sunrise Motel knew or should have known that the Sunrise Motel where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

343.     Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Sunrise Motel repeatedly failed to stop these actions.

344.     Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of

enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

345.    For years, Defendant Sunrise Motel has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

346.    The acts and omissions of Sunrise Motel served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE CONTY'S MOTEL

347.    The Conty's Motel has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

348.    The Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

349.    Upon information and belief, from approximately 2015 to 2016, S.Y. was trafficked by Gregory Hines (aka Bowlegs) and by others at the Conty's Motel.

350.    During the relevant time period, the Conty's Hotel designated a section of its hotel for "long term guests." This is the section of the hotel where S.Y. was trafficked.

351.    Hotel staff saw S.Y. with Gregory Hines on numerous occasions and at one point Hines

sold S.Y. to a "John" for multiple days and hotel staff saw S.Y. with the "John" during that time

period and did not take appropriate actions to help S.Y.

352.    In addition to witnessing S.Y. being trafficked, sex trafficking activities and drug use were

conducted in the open at Defendants' property.

353.    The Plaintiff's room was also frequented by many men on a daily basis and contained

evidence of sex trafficking and drug use.

354.    If the staff at the Conty's Motel had been properly trained, the obvious signs of sex

trafficking would have been recognized and reported.

355.    Conty's Motel failed to implement and enforce any of its own policy or policies to protect

Plaintiffs S.Y. from being sex trafficked.

356.    Defendant Conty's Motel knew or should have known that the Conty's Motel where

Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex

trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

357.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs

at their hotel, Defendant Conty's Motel repeatedly failed to stop these actions.

358.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist

its agents, employees, operators, and brand managers in identifying human trafficking and

indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human

trafficking and a national hotline; (iii) providing a process for reporting and escalating human

trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all

employees to attend training related to handling a situation involving human trafficking; (v)

providing new hire orientation on human rights, corporate responsibility and whistleblowing of

enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

359.    For years, Defendant Conty's Motel has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

360.    The acts and omissions of Conty's Motel served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

**TRAFFICKING OF S.Y. AND C.S AT THE GLADES MOTEL**

361.    The Glade's Motel has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

362.    The Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

363.    Upon information and belief, from approximately 2015 to 2016, S.Y. was trafficked by Gregory Hines (aka Bowlegs) and by others at the Glade's Motel.

364.     During the relevant time period, Gregory Hines negotiated a deal whereby he would pay double the standard room rate in cash in exchange for the Glade's Motel to permit sex trafficking and other illegal activities to take place on the property.

365.   The Defendants knew the deal it had negotiated with Gregory Hines permitted sex trafficking and then witnessed the Plaintiff's room to be frequented by many men on a daily basis and the room also contained evidence of sex trafficking and drug use.

366.   If the staff at the Glade's Motel had not negotiated a deal to permit trafficking, and had been trained to recognize the signs of sex trafficking, the trafficking of S.Y. at the Glade's Motel would have been prevented.

367.     In addition to witnessing S.Y. being trafficked, sex trafficking activities and drug use were conducted in the open at Defendants' property.

368.   The Plaintiff's room was also frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

369.   If the staff at the Glade's Motel had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

370.   Glade's Motel failed to implement and enforce any of its own policy or policies to protect Plaintiffs S.Y. from being sex trafficked.

371.   Defendant Conty's Motel knew or should have known that the Glade's Motel where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

372.   Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Glade's Motel repeatedly failed to stop these actions.

373.     Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

374.     For years, Defendant Glade's Motel has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

375.     The acts and omissions of Glade's Motel served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

**TRAFFICKING OF S.Y. AND C.S AT THE INN OF NAPLES**

376.    The Inn of Naples has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

377.    These Defendants knew or should have known that pimps and sex traffickers used their hotel to facilitate the trafficking of women for sex.

378.    Upon information and belief, from approximately 2015 to 2016, S.Y. and C.S. were trafficked by Gregory Hines (aka Bowlegs), Keith Lewis (aka Big Mike), and by others at the Inn of Naples.

379.    During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' property.

380.    Hotel staff, guests, police, and EMS all observed Plaintiffs numerous times in common areas and eating areas of the hotel in apparent distress, half naked, bleeding, overdosed, crying, in clear need of help. At no time did staff at the Inn of Naples take appropriate action to report what they saw and save S.Y. and C.S. from their traffickers.

381.    The Plaintiffs' room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

382.    If the staff at the Inn of Naples had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

383.    The Inn of Naples failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S.Y. and C.S. from being sex trafficked.

384.    Defendant Inn of Naples knew or should have known that the Spinnaker hotel where Plaintiffs S.Y. and C.S. was trafficked was an area known for high incidence of crime and prone

to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. and C.S. were trafficked.

385.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Inn of Naples repeatedly failed to stop these actions.

386.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

387.    For years, Defendant Inn of Naples has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

388.    The acts and omissions of Inn of Naples served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation

by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## TRAFFICKING OF S.Y. AND C.S AT THE FAIRWAYS INN

389.    The Fairways Inn has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

390.    These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

391.    Upon information and belief, from approximately 2014, S.Y. was trafficked by Anthony Barrata and by others at the Fairways Inn.

392.    During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' property.

393.    The Plaintiff's room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

394.    If the staff at the Fairways Inn had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

395.    Fairways Inn failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S.Y. from being sex trafficked.

396.    Defendant Fairways Inn knew or should have known that the Fairways Inn where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

397.    Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Garden Inn repeatedly failed to stop these actions.

398.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

399.    For years, Defendant Fairways Inn has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

400.    The acts and omissions of Fairways Inn served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

**TRAFFICKING OF S.Y. AND C.S AT THE PARKSHORE RESORTS**

401.     Parkshore Resorts has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

402.     These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

403.     Upon information and belief, in approximately 2014, S.Y. was trafficked by Jimmy Fischer and by others at Parkshore Resorts.

404.     During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' property.

405.     During the relevant time period, on multiple occasions,  police were called to Parkshore Resorts for activities that indicated sex trafficking was taking place on the property.

406.     The Plaintiff's room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

407.     If the staff at the Parkshore Resorts had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

408.     Parkshore Resorts failed to implement and enforce any of its own policy or policies and protect Plaintiff  S.Y. from being sex trafficked.

409.     Defendant Parkshore Resorts knew or should have known that the Parkshore Resorts where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

410.     Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Parkshore Resorts repeatedly failed to stop these actions.

411.    Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

412.    For years, Defendant Parkshore Resorts Inn has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

413.    The acts and omissions of Parkshore Resorts served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## **TRAFFICKING OF S.Y. AND C.S AT THE SEA SHELL MOTEL**

414.     The Sea Shell Motel has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

415.     The Sea Shell Motel has been on notice of repeated incidences of sex trafficking occurring on its property, yet it has failed to take the necessary actions to prevent sex trafficking from taking place.

416.     These Defendants knew or should have known that pimps and sex traffickers use their hotel to facilitate the trafficking of women for sex.

417.     Upon information and belief, from approximately 2015 to 2016, S.Y. was trafficked by Keith Lewis (aka Big Bike) and by others at the Sea Shell Motel.

418.     During the relevant time period, sex trafficking activities and drug use were conducted in the open at Defendants' property.

419.     The Plaintiff's room was frequented by many men on a daily basis and contained evidence of sex trafficking and drug use.

420.     If the staff at the Sea Shell Motel had been properly trained, the obvious signs of sex trafficking would have been recognized and reported.

421.     Sea Shell Motel failed to implement and enforce any of its own policy or policies and protect Plaintiffs  S.Y. from being sex trafficked.

422.     Defendant Sea Shell Motel knew or should have known that the Sea Shell Motel where Plaintiff S.Y. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff S.Y. was trafficked.

423.     Despite having clear evidence of the extensive prostitution and sex trafficking that occurs at their hotel, Defendant Sea Shell Motel repeatedly failed to stop these actions.

424.     Defendants could have prevented sex trafficking, by: (i) distributing information to assist its agents, employees, operators, and brand managers in identifying human trafficking and indications of an illegal enterprise or suspicious activity; (ii) posting notices on what is human trafficking and a national hotline; (iii) providing a process for reporting and escalating human trafficking concerns within the organization, and to appropriate outside agencies; (iv) requiring all employees to attend training related to handling a situation involving human trafficking; (v) providing new hire orientation on human rights, corporate responsibility and whistleblowing of enablers; (vi) providing training and education to its hotels through webinars, seminars, conferences, and online portals on how to respond to suspected human traffickers, victims and suspicious activity; (vii) developing and holding ongoing training sessions on human trafficking; or providing checklists, escalation protocols and information to property management staff; or tracking performance indicators and key metrics on human trafficking prevention; (viii) providing steps it can take to deter traffickers and decline forms of bribery;  and (ix) ensure strict security protocols, credit cards only, and no loitering.

425.     For years, Defendant Sea Shell Motel has failed to take adequate steps to prevent the rampant culture of sex trafficking which tragically occurs on their property.

426.     The acts and omissions of Garden Inn served to support, facilitate, harbor, and otherwise further the traffickers' sale and victimization of the Plaintiff for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

## **CAUSES OF ACTION**

427.     The injuries and harms that the Plaintiffs suffered as a result of the Defendants' negligent operations of their hotels and failure to make the premises safe, are of a permanent and/or continuing nature.

428.     The Defendants as hotel operators had a continuing legal duty to protect their hotel guests and other invitees, like the Plaintiff, to use ordinary care to keep the premises in a reasonably safe condition and protect them from harm due to reasonably foreseeable risks of injury, regardless if the guests were utilizing the hotels' common rooms, facilities, exterior passageways, or within the confines of the rented rooms.[18]

429.     The Defendants failed in their duties to the Plaintiffs to provide security and other precautions to prevent the criminal acts upon the Plaintiffs by third parties on a regular basis. The attacks upon the Plaintiffs by the "Johns" and staff persons were foreseeable and thus arose a duty by the Defendants to protect the Plaintiffs.

430.     The Defendants observed, knew or should have known there was a foreseeable increased risk that illegal sex and drug trafficking was occurring on their premises and that the Plaintiffs might be harmed during the rental of the Defendants' hotel rooms.

431.     To Defendants, as hotel owners and operators, the crime of human sex trafficking was a foreseeable risk because the long history, prevalence and extent of this sex slavery is commonly known in the hospitality industry, the local community and throughout the state; the Defendants as hotel owners and operators are a vehicle with which the crime of human sex trafficking is readily carried out, furthered, harbored and made financially viable.

432.     Significantly, the Defendants knew or should have known there was a foreseeable increased risk that illegal sex trafficking was occurring, that tragic incidents occur as a result, and

---

[18] 17 Fla. Jur., Hotels, Restaurants, and Motels, § 24; 40 Am.Jur.2d, Hotels, Motels, and Restaurants, § 111.

that the Plaintiffs as hotel guests might be harmed due to prior similar incidents at Defendants'
hotels.

433.    Accordingly, the Defendants should have taken steps to prevent sex and drug trafficking
in their hotels in accordance with applicable Federal, State and local laws and guidelines.

434.    Accordingly, because human sex trafficking and other illegal activity associated therewith
was foreseeable, the Defendants had a duty to take adequate security or remedial measures to
protect their guests from criminal activity, to wit, the Plaintiff.

435.    The Plaintiffs' injuries and consequential damages were the direct and proximate result of
the Defendants' acts and omissions, namely:

> u.  Failure to provide training regarding human trafficking awareness to employees
> who perform housekeeping duties, maintenance, or who work at the front desk;
>
> v.  Failure to provide guidance on how to identify individuals who may traffickers
> or their victims of the sex trafficking;
>
> w. Failure to establish, implement or enforce a protocol on reporting suspected
> human trafficking;
>
> x.  Failure to establish, implement or enforce a protocol to respond to situations
> involving human trafficking;
>
> y.  Failure to enforce provisions within employee manuals or handbook on how to
> handle general emergency situations or manage criminal risks;
>
> z.  Failed to require their agents, servants, franchisees and/or employees to
> participate, complete and continue education regarding sex trafficking in hotels.
>
> aa.  Failed to remove and/or refuse subsequent accommodations to the Plaintiffs'
> sex traffickers when conduct displayed on the premises included a combination

of intoxication, profanity, lewdness, or brawling; disturbing the peace or comfort of other guests; illegal activity; disorderly conduct; and drug dealing;

bb. Allowed rental of hotel rooms without conferring with senior management notwithstanding the suspicions;

cc. Failure to correct or remedy protocols that were defective or ineffective in preventing or handling prior sex and drug trafficking incidents at Defendant's hotel property;

dd. Failed to provide adequate security personnel in their hotels to protect their guests;

ee. Failed to establish, implement and enforce appropriate security policies and procedures for certain times of day, room locations, and suspicious activity.

ff. Permitted unknown persons to loiter, to gain entry to guest hallways, to know room numbers, have access to room keys;

gg. Failure to check the background of the hotel employees for sex crimes and other unlawful acts; and

hh. Otherwise failing to use reasonable care for the safety of their guests.

436.    By failing to act, the Defendants, by and through their actual or apparent agents, servants, franchisees and/or employees, allowed the Plaintiffs to be harbored and confined for sexual acts while collecting rental fees thereon. This willful blindness, negligence, or indifference for the health and welfare of the Plaintiffs spanned over many months and exceeds all bounds of decency.

Pursuant to Florida's statute  501.204, Defendants have engaged in unconscionable and unfair acts or practices in the conduct of the hospitality industry.

437.    As a further direct and proximate result of the  Defendants' conduct and lack of due and reasonable care, the Plaintiffs had incurred expenses, fees, and costs of medical care and attention to their injuries, including: (1) physicians' fees; (2) medications and medical supplies; (4) hospitalizations; and (5) transportation costs to and from various physicians' offices and hospitals.

438.    As a further direct and proximate result of the Defendants' conduct and lack of due and reasonable care, the Plaintiffs has suffered great physical and mental pain, and will continue to suffer such pain for the indefinite future, for which the Plaintiffs should also be compensated by the Defendants.

### COUNT I
### (Against All Defendants)
### VIOLATION OF 18 U.S.C. § 1595 ("TVPRA")

439.    Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

440.    Plaintiffs S.Y. and C.S. are victims of sex trafficking within the meaning of 18 U.S.C. § 1591 and are therefore entitled to bring a civil action under 18 U.S.C. § 1595 against any individual or entity who knowingly benefits, financially or by receiving anything of value from participation in a venture which that entity or person knew or should have known has engaged in violations of the TVPRA.

441.    Each Defendant knowingly benefited from the sex trafficking of S.Y. and C.S. by receiving payment for the rooms rented for S.Y. and C.S. and their traffickers. In addition,

the Defendants received other financial benefits in the form of food and beverage sales and ATM fees from those persons who were engaging in sex trafficking.

442.    Each Defendant knew or should have known the about the nature of the sex trafficking venture at their properties for the reasons stated above which include, but are not limited to:

   a.   Requests by the traffickers to rent rooms near exit doors;

   b.   Cash payments for the rooms by the sex traffickers;

   c.   Refusal of housekeeping services by those persons engaged in sex trafficking;

   d.   Excessive used condoms located in the rooms used for sex trafficking;

   e.   Excessive requests for towels and linens in the rooms used for sex trafficking;

   f.   Hotel staff observing S.Y. and C.S. and their traffickers in the hotel;

   g.   S.Y. and C.S. being escorted by traffickers in the hotel;

   h.   Pleas and screams from help coming from the rooms of S.Y. and C.S.;

   i.   Operation of sex trafficking ventures out of the same hotel room for multiple days or weeks in succession;

   j.   Multiple men per day coming and going from the same rooms without luggage or personal possessions;

   k.   Online reviews of Defendants' properties which described prostitution and commercial sex work taking place at Defendants' properties; and

   l.   Knowledge of police and EMS activity at Defendants' properties and at other locations near Defendants' properties that is related to commercial sex work;

443.    The Defendants were participating in a venture under 18 U.S.C. § 1595(a) by engaging in a pattern of acts and omissions that were intended to support, facilitate,

harbor, and otherwise further the traffickers' sale and victimization of the Plaintiffs for commercial sexual exploitation by repeatedly renting rooms to people Defendants knew or should have known were engaged in sex trafficking.

444.    For the reasons set forth herein, Plaintiffs S Y. and C.S. suffered and will continue to suffer substantial economic, physical, and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591.

## COUNT II
### (Against All Defendants)
### Violation of Fla. Stat. § 772.104

445.    Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

446.    Plaintiffs S. Y. and C. S. bring this claim against the Defendants under Fla. Stat. § 772.104.

447.    The Defendants are associated for the common purpose of profiting off an established sex trafficking scheme.  This association-in-fact is therefore an enterprise (the "RICO Enterprise") within the meaning of Fla. Stat. § 772.102(3).

448.    The Defendants conducted or participated in, or conspired to conduct or participate in, the affairs of the RICO Enterprise through a pattern of numerous acts of racketeering activity defined under Fla. Stat. § 772.102(1)(a)(15) and in violation of Fla. Stat. § 772.103, related by their common purpose to profit off an institutionalized sex trafficking scheme.

449.    Specifically, the Defendants conducted or participated in, and/or conspired to conduct or participate in, the affairs of the RICO Enterprise by knowingly, or with reckless disregard, maintaining sex trafficking as defined by Fla. Stat. § 787.06(2)(f).

450.    As described in the preceding paragraphs, the Defendants maintained sex trafficking by knowingly, or with reckless disregard, repeatedly allowing sex trafficking to occur on their premises between 2013 and 2016.

451.    In exchange for maintaining the sex trafficking scheme, the Defendants received a financial benefit in violation of Fla. Stat. § 787.06(3), namely, repeated payments for rooms used for sex trafficking.

452.    These predicate acts of racketeering activity described above constitute a "pattern of racketeering activity" as defined in Fla. Stat. § 772.102(4) and furthered the common purpose of the RICO Enterprise to profit from a sex trafficking scheme.

453.    The Defendants' acts have yielded consistent results and caused economic, physical, and psychological injuries to the Plaintiffs.

454.    As set forth in the preceding paragraphs, the racketeering acts have similar participants. The Defendants are all hospitality companies that provide lodging through their portfolio of brands.

455.    As set forth in the preceding paragraphs, the Defendants directed their racketeering activities at common victims, S.Y. and C.S.

456.    As set forth in the preceding paragraphs, the Defendants' acts have similar methods of commission, such as maintaining their deficiencies in implementing and enforcing policies and protocols regarding sex trafficking at their hotels in order to maximize their profits.

457.    As a direct and proximate result of the Defendants' acts discussed in this section, by and through their agents, servants, franchisees and/or employees, Plaintiffs S.Y. and C.S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting in pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All of the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

**COUNT III**
**(Against All Defendants)**
**Premise Liability**

458.    Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

459.    At all times material to this complaint, the Plaintiffs, while business invitees or otherwise lawfully present upon said premises, did sustain injuries as a result of Defendants' patrons and the criminal activity carried on therein. Defendants, by and through their agents, servants, franchisees and/or employees owed a duty to maintain the subject premises in a reasonably safe condition and free from conditions that would render it dangerous and unsafe for the Plaintiffs.

460.    The Defendants, by and through their agents, servants, franchisees and/or employees owed a duty to exercise reasonable care to protect the Plaintiff, by inspection or other affirmative acts, from the danger of any reasonably foreseeable harm occurring from the reasonably foreseeable use of the premises by sex traffickers.

461.     The Defendants, by and through their agents, servants, franchisees and/or employees owed a duty to exercise reasonable care to keep their hotel guests safe by implementing and enforcing security measures and proper protocols.

462.     The Defendants, by and through their agents, servants, franchisees and/or employees owed a duty to safeguard the Plaintiffs against criminal conduct that the Defendants could reasonably foresee happening on their business premises.

463.     The Defendants, by and through their agents, servants, franchisees and/or employees owed a duty to maintain their entire hotel premises in a hospitable, safe and reasonable manner, as well as to those areas beyond the hotels' property lines for which Defendants had possession, custody or control of.

464.     The Defendants had actual or constructive knowledge of prior similar sex trafficking incidents carried out on their premises and other hotel properties they owned.

465.     The Defendants knew or should have known, in light of all the attendant circumstances stated herein, that the risk of such criminal conduct taking place would be unreasonably high without the Defendants' hotels taking appropriate security precautions against such conduct as well as protocols for reporting and refusing such conduct.

466.     The Defendants, by and through their agents, servants, franchisees and/or employees had actual knowledge of the dangerous condition the Plaintiffs were in, or in the alternative, that the dangerous condition existed for a sufficient length of time so that the Defendants, in the exercise of ordinary care, should have known of the conditions, thereby giving the Defendants constructive knowledge of the Plaintiffs' peril; and/or that the condition occurred with regularity and was therefore foreseeable; and/or Defendants

should have known of the dangerous condition or peril by conducting proper and reasonable inspection of their premises or guests' conduct.

467.    Because human sex trafficking and associated conduct was foreseeable, the Defendants had a duty to take adequate measures to protect their guests, including the Plaintiff, from being victims of continued sex trafficking.

468.    At all times material, the Defendants, by and through their agents, servants, franchisees and/or employees created and/or allowed the dangerous condition to exist within their premises and/or failed to keep the Plaintiffs safe while on the premises.

469.    The Defendants could have taken any number of corrective measures to make the dangerous conditions cease, including not accepting payments, not allowing "Johns" to enter their hotel premises, etc. In failing to take any of these measures to report and remove the dangerous condition from their premises, the Defendants failed to take reasonable care to protect the Plaintiff, their hotel guest.

470.    Furthermore, by leaving the premises open and unattended, the Defendants encouraged the use of the premises by loiters, pimps, criminals, rapists and drug dealers to run their own criminal venture, prostitute, batter, falsely imprison, overdose, enslave, and gravely injure women, such as Plaintiff, who – because of their fear, mental state, financial restraints and physical injuries from the forced sex occurring in Defendants rooms – were unable to rescue themselves. Accordingly, the Defendants' failure to act effectively enabled their hotel room(s) to confine and/or imprison the Plaintiffs without any safe means of escape from the "Johns" and/or "pimps".

471.    The Defendants, by and through their agents, servants, franchisees and/or employees breached their duty owed to the Plaintiff, and were negligent by:

ii.  Creating a dangerous condition; and/or

jj.  Failing to correct the aforementioned dangerous condition; and/or

kk. Failing to report and refuse renting to the traffickers; and/or

ll.  Failing to properly and adequately maintain the premises in a reasonably safe condition;

mm.                                                                                        Failing to monitor and prevent their staff and agents from conducting and engaging in illegal sex and drug trafficking; and/or

nn. Failing to have security measures to protect the Plaintiff; and/or

oo. Failing to take affirmative steps to investigate suspicious conduct and forbid criminal conduct.

472.    As a direct and proximate result of the acts and omissions of the Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S.Y. and C.S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All of the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

**COUNT IV**
**(Against All Defendants)**
**<u>Breach of Contract - Intended Third Party Beneficiary</u>**

473.     Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

474.     Upon information and belief, the Defendants had a handbook, manual or protocol for their staff for the safety and care of their hotel guests, as well as a risk management plan.

475.     The Plaintiffs were hotel guests and therefore was the intended third-party beneficiary who had a contractual right to receive such safety, security and care by the Defendants' personnel.

476.     The Defendants, by and through their agents, servants, franchisees and/or employees breached their duty owed to the Plaintiff, and were negligent by:

      pp. Failing to adhere to hospitality standards; and/or

      qq. Failing to adhere or enforce the protocols or security mechanisms; and/or

      rr.  Failing to adequately train their staff /agents how to monitor for illegal sex and/or drug activity on their premises and actions to take when observed; and/or

      ss. Failing to have a complete risk management plan in place or implement the appropriate protocols therein.

477. As a result, the Plaintiffs did not receive the benefit of the security protection, employee training or protocols that the Defendants' hotels set up for the benefit of their hotel guests, to wit, Plaintiff S.Y. and Plaintiff C.S.

478. The Plaintiffs have suffered economic and personal injury as intended third-party beneficiary due to the Defendants' breach of each of their employee manuals, handbooks, risk management plans, or otherwise.

479. As a direct and proximate result of the acts and omissions of the Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S.Y. and C.S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

**COUNT V**
**(Against All Defendants)**
**Negligent Hiring, Entrustment and Supervision**

480. Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

481. The Defendants' agents, employees, franchisees and/or servants negligently authorized criminals to rent rooms for prostitution and drug dealing, creating a foreseeable risk that the Plaintiffs would be sold, used, abused, drugged, beaten and forced to engage in conduct for fear of their lives.

482. The Defendants' agents, employees, franchisees and/or servants failed to either identify and/or report the human sex trafficking and foreseeable harm of the Plaintiff.

483. The Defendants' agents, employees, franchisees and/or servants failed to refuse continued lodging services to human sex traffickers.

484. The Defendants were in control of the hiring and performing background checks of said agents, employees, franchisees and/or servants; of instructing, training and

supervising said agents, employees, franchisees and/or servants; and the decisions to terminate said agents, employees, franchisees and/or servants.

485. At all times, the Defendants were negligent in their hiring, employment and termination decisions, and the said negligent decisions caused the Plaintiffs to be injured.

486. It was foreseeable that the Defendants' acts and omissions increased the risk that these illegal acts would regularly occur on their premises and would cause harm to the Plaintiff. But for the negligence and omissions of the Defendants, the criminal conduct, including human sex trafficking, on the foregoing dates could have been prevented and/or stopped.

487. Accordingly, the Defendants are liable for all harmful results that are the normal incidents of, and within the increased risk caused by their negligent acts and omissions.

488. As a direct and proximate result of the acts and omissions of the Defendants, by and through their agents, servants, franchisees and/or employees-which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S.Y. and C.S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future

**COUNT VI**
**(Against All Defendants)**
**Negligent Rescue**

489. Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

490. At all times material to this litigation, the Defendants were in full possession and complete control of their hotels in that Defendants are the owners in fee simple and ran a profit business of renting out rooms on their premises.

491. The Defendants knew or should have known that suspicious activity, illegal transactions, abuse, crimes, drugs and sex slavery were a regular occurrence on their premises and were being conducted by a regular group of individuals.

492. The Defendants knew or should have known that this type of environment poses a danger on their premises.

493. The Defendants had a duty to keep their hotel guests and their premises safe and prevent foreseeable criminal activity.

494. The Defendants had a duty to take appropriate actions that would properly inform themselves and make the appropriate repairs to make their hotels safe, or otherwise frustrate criminal activity.

495. By failing to act and prevent suspicious behavior, Defendants caused dangerous conditions to occur, exist and continue on their premises at all relevant times in this complaint.

496. Accordingly, the Defendants knew or should have known that an illegal sex trafficking venture and drug conduct was occurring on their premises but took no appropriate actions to properly investigate, report, cease or prevent the illegal conduct, nor to safeguard their hotel guests and rescue the Plaintiffs from the peril they caused by renting the rooms for extended stays to human sex traffickers.

497. During all relevant times, the Defendants financially benefitted from the rental money, where the Plaintiffs were held as a sex slave, and the consistent occupancy. By failing to prevent or correct the dangerous conditions on their premises, Defendants' nonfeasance allowed the "Johns'" continuing demand for the Plaintiffs' services to always be met.

498. As a result of the Defendants' authorization, facilitation, access, financial benefits and concealment of the sex trafficking and drug use on their premises, the Plaintiffs were placed in peril.

499. The Defendants had a duty to make safe a dangerous condition on their premises and to rescue their hotel guests from the peril they created, as well as to protect their hotel guests from foreseeable criminal activity. The agents of Defendants had a duty to act as reasonably prudent person under emergency circumstances to rescue the Plaintiffs when they observed the Plaintiffs nearly stumbling onto the adjacent highway, overdosed, injured and/or being beaten.

500. The Defendants failed to protect and failed to rescue the Plaintiffs given their legal duty to rescue the Plaintiffs as a result of the hotel-guest relationship and because the Defendants placed the Plaintiffs in the peril of continued and extended forced sex services.

501. The Defendants failed to act as reasonably prudent hotel owners and operators, especially in light of the prior incidents and known issues in the industry and in the community.

502. The Plaintiffs suffered physical, mental, emotional and economic damages as the result of the Defendants' actions and inactions.

503. As a direct and proximate result of the acts and omissions of Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S.Y. and C.S. have suffered

property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

### COUNT VII
### (Against All Defendants)
### <u>Unjust Enrichment</u>

504. Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

505. By failing to prevent or correct the dangerous conditions on their premises, the Defendants' nonfeasance enabled the criminal enterprise to continue on their premises, which allowed the "Johns'" continuing demand for the Plaintiffs' services to always be met. During all relevant times, Defendants financially benefitted from the consistent occupancy and rental money of the rooms, which is where the Plaintiffs were held as sex slaves.

506. While the Defendants were profiting from these conditions, the Plaintiffs were suffering; these continuous and repeated dangerous conditions as a sex slave resulted in bodily injuries and mental harm. The Plaintiffs continue to suffer PTSD to this day as a result of those circumstances and harm.

507. Accordingly, the Defendants received benefits at the expense of the Plaintiff; the Defendants benefitted financially and/or received something of value from allowing rooms to be rented where the Plaintiffs were exploited, confined, abused and forced to

perform sexual acts. Among other things, the Defendants took the money from the forced sexual services for room rental fees.

508. The Defendants received unjust enrichment from the sale of products while the above patrons were on the premises, including the "Johns".

509. By the Defendants' inactions the Defendants received unjust enrichment in "inviting back" the Plaintiffs and their sex traffickers on a rotational basis throughout the above time period.

510. Equity mandates such payments be returned to the Plaintiff.

511. As a direct and proximate result of the acts and omissions of the Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S.Y. and C.S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

## COUNT VIII
### (Against All Defendants)
### Aiding and Abetting, Harboring, Confining, Coercion and Criminal Enterprise

512. Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

513. The Defendants affirmative acts of renting their hotel rooms for extended amount of time to the Plaintiffs' sex traffickers for sex trafficking, and failure to report illegal

conduct to the authorities caused the Plaintiffs to be routinely confined to the hotel rooms and their premises.

514. The Defendants desired the Plaintiffs' continuous occupancy of the hotel rooms as it generated revenue, even if said occupancy was related to suspicious or criminal activity.

515. The Defendants knew that the Plaintiffs had no reasonable means of escape due to the physical barricades of the Plaintiffs' sex traffickers in the hallways, forced drug use, or physical restraints.

516. The Defendants knew that the Plaintiffs did not leave their hotel rooms for extended period of times, nor allowed maintenance to come into their hotel rooms.

517. The Plaintiffs' imprisonment or forced confinement arose out of the Defendants' continuous negligent operations in approximately 20134 through approximately February of 2016. The Defendants' negligent operations aided "Johns" to find and enter the Plaintiffs' room thereby allowing others to wrongfully enter or invade the Plaintiffs' right of private occupancy.

518. The Defendants' negligent operations allowed "Johns" to make the Plaintiffs their sex slaves.

519. The Defendants facilitated or assisted the criminal enterprise by either willful blindness, gross negligence, and/or indifference.

520. Accordingly, the Defendants are liable for all foreseeable damages that arose from the Plaintiffs' confinement, forced labor, drug use, and slavery that continually took place at the Defendants' hotels.

521. As a direct and proximate result of the acts and omissions of the Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the

continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S.Y. and C.S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

**COUNT IX**
**(Against All Defendants)**
**Negligent Infliction of Emotional Distress**

522. Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

523. The Defendants had reasonable knowledge and/or notice of the events of trafficking occurring on their premises and failed to take action to prevent the trafficking and/or protect their patrons, the Plaintiff.

524. The Defendants owed the Plaintiffs a duty of care and to not cause emotional distress or loss of bodily function.

525. The Defendants breached said duty by failing to act, which subjected the Plaintiffs to suffer continuous and repetitive dangerous conditions as set forth herein that is extreme and outrageous. Indeed, human trafficking and sex slavery transcend all bounds of human decency. As a result, the Plaintiffs were subject to severe emotional and physical trauma by the inaction of the Defendants.

526. As a direct and proximate result of the acts and omissions of Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and

through approximately February of 2016 – Plaintiffs S. Y. and C. S.  have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss  of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

527. Due to all of the above allegations against the Defendants, the Plaintiffs plead allowance to recover damages, court costs and reasonable attorney's fees.

**COUNT X**
**(Against All Defendants)**
**Assault and Battery and Kidnapping Offenses**

528. Plaintiffs S.Y. and C.S. adopt and incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

529. The Plaintiffs' sex traffickers intended to place Plaintiffs in fear; to control Plaintiffs; and to touch, use, abuse and sell the Plaintiffs like a piece of property. The Plaintiffs' sex traffickers did in fact control, touch, use, abuse and sell the Plaintiffs like a piece of property, and the Plaintiffs were in fact fearful for their lives. All other Defendants had reasonable knowledge and/or participation of said assault and battery against the Plaintiffs.

530. The Plaintiffs' sex traffickers intended to confine, restrain, control and imprison the Plaintiffs as sex slaves against their will. The Plaintiffs' sex traffickers did in fact confine, restrain, control and imprison the Plaintiffs against their will. All other Defendants had reasonable knowledge and/or participation of said assault and battery against the Plaintiffs because of the outward appearance of Plaintiffs' bruises and lacerations.

531. As a direct and proximate result of the acts and omissions of the Defendants, by and through their agents, servants, franchisees and/or employees – which lead to the continuous dangerous condition on the hotel premises in approximately 2013 and through approximately February of 2016 – Plaintiffs S. Y. and C. S. have suffered property damage and bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiffs will suffer from such losses in the future.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs demand judgment against all the Defendants on each of the above-referenced claims and Counts and as follows:

1. Awarding compensatory damages to the Plaintiffs for past and future damages for the described losses with respect to each count, including but not limited to pain and suffering for severe and permanent personal injuries sustained by the Plaintiffs, health care costs, medical monitoring, together with interest and costs as provided by law;

2. For any other causes of action and/or claims as may be compensable under local laws and/or statutes as may apply under the laws in the jurisdiction and venue in which this case will be transferred for trial;

3. Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish the Defendants and deter future similar conduct;

4. Awarding the Plaintiffs reasonable attorney's fees;

5.  Awarding the Plaintiffs the costs of these proceedings; and

6.  Such other and further relief as this Court deems just and proper.

### JURY DEMAND

Plaintiff S.Y. and Plaintiff C.S. hereby demand a trial by jury.

Law Office of Sharon M. Hanlon, PA
Attorney for Plaintiff
5633 Naples Boulevard
Naples, Florida 34109
Telephone: (239) 598-3222
shanlon@zelmanandhanlon.com
gcohen@zelmanandhanlon.com

s/ **Sharon M Hanlon**
Sharon M Hanlon, Esq
FL Bar Number: 946620

And

Yale T Freeman, PA
Attorney for Plaintiff
999 Vanderbilt Beach Road, Suite 200
Naples, FL  34108
Telephone: (239) 530-2500
freeman@ytfreemanlaw.com

s/ **Yale T Freeman**
Yale T. Freeman, Esq
FL Bar Number: 161855

OF COUNSEL (*pro hac vice* motion forthcoming)

Michael A. London
Brian J. Perkins
Diana Yastrovskaya
DOUGLAS & LONDON, P.C.
59 Maiden Lane, 6th Floor
New York, New York 10038
Ph: (212) 566-7500
Fax: (212) 566-7501
mlondon@douglasandlondon.com
bperkins@douglasandlondon.com
dyastrovskaya@douglasandlondon.com